Argued and submitted April 21, 2015, reversed and remanded March 9, 2016

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ERNIE JOSEPH GARCIA,
*Defendant-Appellant.*

Washington County Circuit Court
C121436CR; A154834

370 P3d 512

Joshua B. Crowther, Deputy Public Defender, argued the cause for appellant. With him on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Peenesh H. Shah, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Sercombe, Presiding Judge, and Hadlock, Chief Judge, and Tookey, Judge.

TOOKEY, J.

Hadlock, C. J., concurring.

## TOOKEY, J.

In this criminal case, defendant appeals a judgment of conviction for coercion, ORS 163.275, menacing, ORS 163.190, harassment, ORS 166.065, and two counts of assault in the fourth degree, ORS 163.160. In his first assignment of error, defendant contends that the trial court erred when it denied his motion to suppress evidence obtained as a result of the law enforcement officers' warrantless search of his home under Article I, section 9, of the Oregon Constitution[1] and the Fourth Amendment to the United States Constitution.[2] We agree that the warrantless search of defendant's home and the seizure of evidence therein violated defendant's rights under Article I, section 9, and accordingly, we reverse and remand.[3]

We review the trial court's denial of defendant's motion to suppress for errors of law. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993). We are bound by the trial court's findings of fact as long as there is constitutionally sufficient evidence in the record to support them. *Id.* at 75. In the absence of express factual findings, we presume that the trial court decided the disputed facts in keeping with its ultimate conclusion. *Id.* On appeal, "[o]ur function is to decide whether the trial court applied legal principles correctly to those facts." *Id.*

We describe the facts consistently with those standards. Officers Barrington and Corning responded to a 9-1-1 call placed by defendant's neighbor. The neighbor reported that he thought a domestic disturbance was occurring at defendant's home because he and his brother

---

[1] Article I, section 9, provides, in part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

[2] The Fourth Amendment provides, in part, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"

[3] In his second assignment of error, defendant contends that the trial court plainly erred by admitting evidence of defendant's prior assault against the alleged victim obtained by the officers during their warrantless search of defendant's home. Our conclusion on the first assignment of error obviates the need to consider that issue, and, accordingly, we do not address the admissibility of the "other acts" evidence raised by defendant's second assignment of error.

had heard mostly male screaming and "possibly hitting" off and on for the last hour coming from defendant's home. Barrington arrived at 3:20 p.m. and parked down the street from defendant's home. While Barrington was awaiting Corning's arrival, Barrington approached defendant's home on foot. He could hear a TV on inside at a low volume, but did not hear any noises like those described by defendant's neighbor.

Corning arrived at 3:27 p.m., and the two officers approached the front door of defendant's home. They noticed that the front door was open but the screen door was shut, and they saw defendant sitting on a couch in his living room but did not see anyone else in the home. Barrington told defendant that they were investigating a disturbance at his home that had been called in by one of his neighbors and requested that he step outside to speak with him. Defendant repeatedly refused to come outside and instead stood in the middle of the doorway. At that time Barrington noticed a strong odor of alcohol coming from defendant, who continued to refuse Barrington's requests to step outside or allow them to come inside. Defendant did not offer any explanation for the noises coming from his home, denied that anyone had been screaming, and repeatedly denied that anyone else was in his home.

Barrington informed defendant that they were investigating a crime, told defendant that he was giving defendant a lawful order to step outside, and informed defendant that, if he refused the lawful order to step outside, he would be arrested. After defendant continued to refuse to step outside, or allow either of the officers to enter his home, Barrington arrested defendant for interfering with a police officer, pulled him out of the doorway onto the front porch, and placed him in handcuffs. Defendant became very hostile and uncooperative, and he began cursing at the officers.

After Barrington advised defendant of his *Miranda* rights, Barrington asked defendant once again if there was anyone else in the home, and defendant admitted that his wife was inside. Because defendant had been so confrontational and had lied to Barrington about defendant's wife being inside the home, Barrington became even more concerned

that defendant's wife was inside and injured. Specifically, Barrington and Corning, who had not heard any other person inside of the home while talking with defendant, were concerned that defendant's wife might be unconscious or injured to the point that she could not respond or request assistance. Barrington then asked defendant if he had been fighting with his wife. Defendant replied that he wanted to speak with his lawyer, and Barrington escorted him to his patrol car which was parked at the end of the street.

After defendant was placed in handcuffs and removed from the front door area, Corning immediately entered the home to see if he could contact defendant's wife, G. Once Corning entered the home, he called out for G from the living room but did not receive a response. Corning began walking down the hallway while identifying himself as a police officer, and G emerged from a room in the back of the home. Corning escorted G to the living room and noticed that G's face and eyes were red, as if she had been crying. Although G was not calm or composed and seemed "kind of frazzled," Corning did not observe any injuries at that time. During the conversation that Corning had with G before Barrington returned from escorting defendant to his patrol car, G stated that she had been in an argument with defendant, but, at that point, she did not indicate that there had been a physical altercation or request any assistance.

After placing defendant in his patrol car and driving back to the front of defendant's home, Barrington entered the home and saw that G was now seated on the couch in the living room. Upon entering the home, Barrington noticed multiple old bruises on G's arms. He also observed that G's face was red as if she had been crying and he asked her if she needed any immediate medical assistance. G refused Barrington's offer to provide medical assistance.

Despite G's refusal of Barrington's offer to provide medical assistance, Barrington, as well as other officers who had arrived, continued to investigate, asking G what had happened in the home. Ultimately, as the questioning continued, G made multiple statements to the police relating to a number of domestic violence incidents, including the one that had occurred on that day.

Based on G's statements to the police and other evidence gathered in the home, defendant was charged with multiple offenses involving domestic violence. He moved to suppress all the evidence gathered as a result of the warrantless entry into his home under Article I, section 9, and the Fourth Amendment. In defendant's motion to suppress, he contended that the officers' warrantless search of his home was not justified by the emergency aid exception to the warrant requirement, and, thus, all evidence derived from the unlawful entry of his home should be suppressed. Alternatively, defendant contended that, once Corning observed that G had no recent injuries and she did not request medical attention, any potential emergency dissipated and all evidence gathered after that point in time should be suppressed.

The state responded that the warrantless entry into defendant's home was justified by the emergency aid exception because the responding officers had a legitimate and valid concern that that there was an emergency, as defined in *State v. Baker*, 350 Or 641, 260 P3d 476 (2011), which set out the requirements for the emergency aid exception under Article I, section 9. Furthermore, the state argued that, once the officers got into the home, they developed probable cause to investigate further based on G's injuries that they observed in plain view, and that they were obligated under Oregon law to determine who the primary aggressor was in order to make a mandatory arrest. *See* ORS 133.055(2)(c) (in domestic violence situations, ORS 133.055(2)(c) specifically charges investigating officers with making "every effort" to determine who was "the assailant or potential assailant"). Further still, the state argued that, "even if [the] entry was not justified under the emergency aid doctrine [G's] statements and associated evidence should not be suppressed" because, under *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), and, specifically, the inevitable discovery doctrine, as explained in *State v. Taylor*, 250 Or App 90, 279 P3d 254 (2012), "the investigation of [G's] injuries was inevitable because the officers would have returned to investigate possible charges of domestic violence."

At the hearing on defendant's motion to suppress, the trial court first ruled that the officers' entry into

defendant's home was justified by the emergency aid exception to the warrant requirement. Specifically, the court stated that "the officers subjectively believed that there may be another individual involved in this altercation who would need their assistance, either to prevent * * * somebody from getting injured in the future, * * * but more importantly * * * that the person might, in fact, be injured now, and was needing immediate assistance regarding that injury." The trial court concluded that defendant's behavior, intoxication, and statements that there was nothing going on and nobody else was home, in conjunction with the concern that the officers heard nothing coming from the home shortly after the neighbor reported a domestic dispute involving at least two people, made the officers' concern that somebody needed aid objectively reasonable. The trial court then ruled that the emergency had dissipated once Corning entered the home and saw G because there "wasn't any—any indication of any serious physical injuries and according to the officer here, there wasn't any indication of any actual injuries, just that she was clearly upset." In so concluding, the court rejected the state's argument that the officers' statutory obligation to investigate under Oregon's domestic violence laws trumped defendant's constitutional right to privacy.

Nonetheless, the trial court went on to conclude that the inevitable discovery doctrine applied because the officers had developed reasonable suspicion that some altercation had occurred; stating that the officers articulated a reasonable suspicion "that some altercation occurred, and there may have been physical altercation, but clearly they didn't see any injuries or anything like that, so I don't think this developed" into probable cause. The trial court concluded that, under the inevitable discovery doctrine, the officers had "a right to then do further investigation" because they had developed reasonable suspicion. Based on its conclusion that the inevitable discovery doctrine applied in this case, the court denied defendant's motion to suppress.

On appeal, defendant renews his argument that the officers' warrantless entry into his home violated his rights under Article I, section 9, and the Fourth Amendment to be free from unreasonable searches. Defendant argues that, the emergency aid exception to the warrant requirement

did not justify the officers' warrantless entry into his home because the officers' belief that they needed to render aid to someone inside was not objectively reasonable. Alternatively, defendant argues that, even if the police lawfully entered defendant's home, any emergency dissipated once Corning observed G and it became clear she that she had been crying, but it was not evident that she had been in a physical altercation. Thus, defendant contends that any evidence observed or gathered in defendant's home that created a reasonable suspicion of criminal activity was no longer in "plain view" because the emergency had dissipated. Finally, defendant argues that the inevitable discovery doctrine does not apply in this case.

The state responds that the officers' warrantless entry into defendant's home was justified by the emergency aid exception because the officers had an objectively reasonable belief that someone inside the home needed aid. The state further responds that the old bruising on G's arms was observed by Barrington before the emergency had dissipated, and, thus, the officers were not required to leave the home because the officers had developed probable cause, or at least reasonable suspicion, based on their training and experience, and what they observed in plain view before the emergency had dissipated, to believe that defendant had assaulted G. The state concedes that the inevitable discovery doctrine does not apply in this case because there was no proper and predictable police procedure underway that would have inevitably led to the discovery of the evidence. However, the state urges us to apply the material witness exception to the warrant requirement that the Oregon Supreme Court articulated in *State v. Fair*, 353 Or 588, 302 P3d 417 (2013), as an alternative ground for affirmance under *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 20 P3d 180 (2001) (allowing this court to affirm on alternate grounds if certain requirements are met). The state contends that we should look through the trial court's "label" of its analysis to its actual analysis, which the state believes is similar to the analysis in *Fair*, because by the time the emergency had dissipated the officers had developed probable cause, or at least reasonable suspicion, to believe defendant had assaulted G, permitting the officers

to remain in the home and interview her as a material witness to that assault. Finally, the state raises an attenuation argument for the first time on appeal, contending that, even if the officers remained in the home illegally, suppression is not warranted because the officers did not exploit their illegal presence in the home to obtain any of the challenged evidence because G implicitly consented to have the officers in the home when she willingly spoke to the officers.

Defendant responded to the state's alternative ground for affirmance by filing a reply brief, in which he presents three arguments against the application of the material witness exception in *Fair*. First, defendant contends that there was insufficient evidence for a reasonable officer to believe that an offense involving danger of forcible injury to a person had been committed nearby because none of the officers immediately observed an injury, no less a recent injury, after any potential initial emergency dissipated. Second, for those same reasons, defendant asserts that it was unreasonable to assume that G was a witness or had information about an alleged assault. Finally, defendant contends that *Fair* does not apply to this case because the exception established in *Fair* justifies the temporary seizure of a witness but does not justify a warrantless entry or intrusion into an individual's home.

Thus, we must first determine whether the emergency aid exception to the warrant requirement justified the officers' warrantless entry into defendant's home. If it did, we must then determine whether the emergency dissipated when Corning observed that G had only been crying and had not been in a physical altercation, thus requiring the officers to leave defendant's home at that time (unless another exception to the warrant requirement applies). Based on the state's concession that the inevitable discovery doctrine does not apply in this case—a concession with which we agree and which we accept—we need not discuss the applicability of the inevitable discovery doctrine. Additionally, we agree with the trial court that the officers' statutory duty under ORS 133.055(2)(c) to investigate does not trump defendant's constitutional right to privacy in his own home. Rather, if we conclude that the officers were required to leave defendant's home because the emergency had dissipated, we must

then determine whether the material witness exception applies as an alternative ground for affirmance. Finally, if we conclude that the officers violated defendant's constitutional rights we must then consider whether the state's attenuation argument applies as an alternative ground for affirmance.

We consider questions of state law first. *State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983). "Under Article I, section 9, warrantless entries and searches of premises are *per se* unreasonable unless falling within one of the few 'specifically established and well-delineated exceptions' to the warrant requirement." *Baker*, 350 Or at 647 (quoting *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983) (citing *Katz v. United States*, 389 US 347, 357, 88 S Ct 507, 19 L Ed 2d 576 (1967))). "The state has the burden of proving that circumstances existing at the time were sufficient to satisfy any exception to the warrant requirement." *Id.* One such exception is the "emergency aid" exception articulated by the Supreme Court in *Baker*. In *Baker*, the Supreme Court concluded that:

"[A]n emergency aid exception to the Article I, section 9 warrant requirement is justified when police officers have an objectively reasonable belief, based on articulable facts, that a warrantless entry is necessary to either render immediate aid to persons, or to assist persons who have suffered, or who are imminently threatened with suffering, serious physical injury or harm."

*Id.* at 649 (footnotes omitted). To show a warrantless entry into a home was justified by the need to render emergency aid, the state must establish that the officer had a subjective "belief that there is an immediate need to aid or assist a person" and that the belief was "objectively reasonable." *State v. McCullough*, 264 Or App 496, 502, 334 P3d 973 (2014) (citations omitted). In this case, the trial court found, and defendant does not dispute, that the officers subjectively believed that G might be injured and needed immediate assistance regarding that injury when Corning entered defendant's home. Thus, we must decide whether the officers had "an objectively reasonable belief, based on articulable facts, that a warrantless entry [wa]s necessary to either render immediate aid to persons, or to assist persons who have suffered,

or who are imminently threatened with suffering, serious physical injury or harm." *Baker*, 350 Or at 649.

Because a determination of whether there was an objectively reasonable belief that there was an immediate need for assistance is a fact specific inquiry, we begin our analysis with a review of our cases involving police responses to apparent domestic disputes.[4] In *State v. Mazzola (A139257)*, 238 Or App 201, 242 P3d 674 (2010), and *State v. Fredricks*, 238 Or App 349, 243 P3d 97 (2010), we concluded that the warrantless entries into the defendants' homes were not justified under the emergency aid exception to the warrant requirement. In *Mazzola*, police officers responded to a 9-1-1 call reporting that there was "yelling" and "door slamming" noises coming from defendant's property, and we concluded that those were not sounds that would suggest a physical struggle. 238 Or App at 203. When the officers arrived, they encountered the defendant's wife outside with the couple's children and neither the defendant's wife nor the children showed any signs of injury. *Id.* at 204. The defendant's wife was calm and cooperative, and she informed the officers that there had been a verbal altercation, but that it had ended. *Id.* Based on those facts, we concluded that the officers' concerns "were not objectively corroborated—and, indeed, were contradicted by overwhelming evidence that all that had occurred was a 'domestic quarrel' that did not require the officers' intervention." *Id.* at 209. Similarly, in *Fredricks*, police officers responded to a 9-1-1 call reporting a "loud argument" in a motel room and, upon arriving, they heard a male and female engaged in a "loud argument." 238 Or App at 351-52. When the officers knocked on the door, they were immediately met by the defendant who appeared "fairly calm" and agreed to step outside. *Id.* at 352. After the

---

[4] Before *Baker* was decided in 2011, cases involving decisions related to the emergency aid exception were decided under the more exacting standard announced in *State v. Follett*, 115 Or App 672, 680, 840 P2d 1298 (1992), requiring that there was an "emergency" and an immediate need for officer assistance "for the protection of life." We note that *Baker* did not adopt the requirement set forth in *Follett* that the "officer had to believe that the person was in danger of dying." *McCullough*, 264 Or App at 502-03. After *Baker*, "to support the emergency aid exception, the state must prove that the officer, at the time of entry, believed that there was an immediate need to aid or assist a person who has suffered (or is imminently threatened with suffering) serious physical injury or harm" and that belief must be objectively reasonable. *Id.*

defendant stepped outside, an officer entered the motel room and encountered the defendant's female companion who "did not appear to be injured." *Id.* at 352-53. We concluded that, when police overhear a "loud argument, unaccompanied by any sounds of 'physical struggle or an indication that an act of violence has occurred,' a warrantless entry into a defendant's residence is not authorized by emergency the aid doctrine." *Id.* at 358-59.

Conversely, in *State v. Agnes*, 118 Or App 675, 848 P2d 1237 (1993), and *State v. Tabib*, 238 Or App 725, 243 P3d 814 (2010), *rev den*, 350 Or 131 (2011), we concluded that the warrantless entries into the defendants' homes were justified under the emergency aid exception to the warrant requirement. In *Agnes*, police officers responded to a call from a neighbor who reported that he heard "banging, yelling, and screaming" coming from the defendant's home. 118 Or App at 677. When the officers arrived, they could hear people inside yelling, and, when they knocked on the door, the defendant told the officers to go away. *Id.* They continued knocking on the door for several minutes and could hear the defendant "yelling obscenities at them." *Id.* The woman in the apartment came to the door and told the officers that she was fine, but she appeared frightened, and the officers could observe that the furniture was in disarray and that the television was halfway falling off the counter. *Id.* The officers noted that the defendant appeared to be intoxicated. *Id.* When they asked the defendant if he was okay, he "responded with profanity and told them to leave." *Id.* Under those circumstances, we concluded that "[t]he officers reasonably believed that they could ensure the occupants' safety only by immediately going inside." *Id.* at 679. Similarly, in *Tabib*, police officers responded to an anonymous 9-1-1 call reporting that the caller heard sounds "as if someone was being 'slammed around,'" that is, "sounds of one person hitting another," coming from the defendant's home. 238 Or App at 727. When the officers arrived, they did not hear sounds of a physical struggle and spent 20 minutes trying to contact the people in the home. *Id.* at 728. During that time, one of the officers "heard sounds of people in the residence, indicating that the people involved in the struggle were still present." *Id.* at 735. Under those circumstances,

we concluded "that there was an objectively reasonable basis to believe that immediate entry into the residence was necessary to protect life." *Id.*

Based on the circumstances of this case, we conclude that the officers had an objectively reasonable belief that someone inside defendant's home needed aid, and, thus, the emergency aid exception to the warrant requirement justified the officers' warrantless entry into defendant's home. Here, the circumstances suggested that what had occurred may have been more than a verbal dispute. Unlike *Mazzola* and *Fredricks*, where there were reports of a "loud argument, yelling, and door slamming"—sounds that standing alone indicate only that a verbal dispute had occurred—in this case there was a report of yelling and sounds of "possible hitting" coming from defendant's home. Sounds of "possible hitting" are similar to the "banging" noises reported in *Agnes* and the sounds reported in *Tabib* of "someone being slammed around," which indicated that a physical struggle had occurred. Furthermore, in this case, the demeanor of the people whom the officers encountered is unlike that of the people in *Mazzola* and *Fredricks*, where the people were calm and cooperative, and more like the demeanor of the people in *Agnes*. Here, like in *Agnes*, defendant appeared to be intoxicated, was uncooperative and belligerent, and refused to exit his home to speak with the officers. Furthermore, and perhaps most importantly, before he was arrested, defendant repeatedly lied about anyone else being in his home and, during the time the officers were on the porch speaking with defendant, G never made contact with the officers. The officers' knowledge that an identifiable potential victim was present in the home after defendant finally admitted that his wife was inside, in combination with the other circumstances noted above, provided the officers with an objectively reasonable belief that G may have been inside unconscious, injured to the point that she could not respond, or in need of immediate medical assistance. Accordingly, Corning was justified under the emergency aid exception to the warrant requirement to enter defendant's home and call out to G to see if she could respond.

We next consider whether the emergency dissipated when Corning observed that G had only been crying, did

not have any serious physical injuries, did not request any assistance, and G only stated that she had been in an argument with defendant. "The inquiry is necessarily undertaken separately for each case because we consider whether the 'circumstances present grounds for an officer to reasonably believe that immediate police action is [still] required.'" *State v. McDonald*, 168 Or App 452, 459, 7 P3d 617, *rev den*, 331 Or 193 (2000) (quoting *State v. Martofel*, 151 Or App 249, 252, 948 P2d 1253 (1997)). Thus, when a particular emergency dissipates depends on the particular type of emergency and the type of aid that would alleviate that emergency. *Compare Davis*, 295 Or at 239-40 (concluding that any potential emergency had dissipated once the woman the officers believed was being held hostage at gunpoint opened the door and left the hotel room), *with McDonald*, 168 Or App at 459-60 (concluding that it was objectively reasonable for the officer to believe his immediate assistance was still needed to determine the amount, variety, and combination of drugs taken by the defendant to avert an overdose even though the defendant was conscious and adamantly denied any drug use).

Here, Corning's justification when he entered defendant's home to render emergency assistance was his reasonable belief that G was inside and unconscious or injured to the point that she could not respond or request assistance. As noted above, the trial court found that, when Corning entered the home, "[t]here wasn't any—any indication of any serious physical injuries, and according to the officer here, there wasn't any indication of any actual injuries, just that she was clearly upset." Because there is constitutionally sufficient evidence in the record to support that finding we are bound by it. *Ehly*, 317 Or at 75. We also note that Corning testified that G never requested any assistance when he encountered her in her home and G only stated that she had been in an argument with defendant. Because Corning's justification when he entered defendant's home was to ensure that G was not unconscious or injured to the point that she could not respond or request assistance, we conclude that any emergency dissipated once Corning observed that G had only been crying, did not have any serious physical injuries, did not request any assistance, and only stated that she had

been in an argument with defendant. Because Corning did not leave at that time, but instead remained in the home awaiting Barrington's return to ask G additional questions, any observations made or evidence gathered by the officers after the emergency had dissipated, including the evidence of the old bruises Barrington observed and G's statements, are subject to suppression under Article I, section 9, unless another exception to the warrant requirement justified the officers remaining in defendant's home.

The state concedes that the inevitable discovery doctrine does not apply in this case, but contends that we may nevertheless affirm by applying the material witness exception to the warrant requirement announced in *Fair*. Under that exception, a temporary on-the-scene seizure of a likely material witness will be constitutional if

"(1) the officer reasonably believes that an offense involving danger of forcible injury to a person recently has been committed nearby; (2) the officer reasonably believes that the person has knowledge that may aid the investigation of the suspected crime; and (3) the detention is reasonably necessary to obtain or verify the identity of the person, or to obtain an account of the crime."

353 Or at 609.

We conclude that the material witness exception in *Fair* does not apply in this case because the evidentiary record is insufficient to support the material witness exception as an alternative basis for affirmance. In *Fair*, the officers responded to an aborted 9-1-1 call, which was made by the defendant, and which the Supreme Court considered a "tacit invitation by [the] defendant to come to her aid." *Id.* at 599. "The dispatch operator had reported that, during the call, a woman was overheard saying 'stop it' and 'get off me,' a man was heard yelling in the background, and then the call was disconnected." *Id.* at 590. Additionally, "[w]hen the officers initially approached the home, [the] defendant's husband appeared angry and was uncooperative and evasive." *Id.* at 610. Finally, when the officers knocked on the front door and the defendant and her husband answered it, "the officers immediately observed a large swollen area over [the] defendant's right eye." *Id.* Based on those facts,

the Supreme Court concluded that the detention of the defendant that had occurred when the officers ordered her and her husband out on the porch was reasonable because the officers detained the defendant "with probable cause to believe that [the] defendant's husband had assaulted her and under exigent circumstances that arose in the context of the officers' emergency response to an apparent incident of domestic violence." *Id.* at 615. The Supreme Court further concluded that, "in ordering [the] defendant to stay on the porch, the officers acted reasonably in temporarily detaining her for purposes of questioning her as a witness to and victim of a recent or ongoing assault," and "[t]he officers had \* \* \* an objectively reasonable belief that [the] defendant could provide information material to the assault." *Id.*

Here, the circumstances are unlike those in *Fair.* In this case, the officers had responded to a 9-1-1 call from a neighbor who reported "mostly male screaming" and "possible hitting." That call is unlike the call in *Fair*, where the defendant herself called 9-1-1, tacitly inviting the officers to come to her aid, and the dispatcher heard her say "stop it" and "get off me," a man was heard yelling in the background, and then the call was disconnected. Additionally, in this case, at the time the emergency dissipated, there was no indication of any recent physical injuries. Corning observed that G had been crying, was not calm or composed, seemed "kind of frazzled," did not request any assistance, and only stated that she had been in an argument with defendant, whereas in *Fair*, the officers immediately observed a large swollen area over the defendant's right eye. Furthermore, in this case, it was only after continued questioning by Barrington and other officers in defendant's home that G made the statements about the domestic violence incidents. Finally, we do note that there is one similarity between this case and *Fair*. Defendant in this case and the defendant's husband in *Fair* were both uncooperative and evasive. However, uncooperative and evasive behaviors alone do not indicate that a recent or ongoing assault had taken place. Here, at the time the emergency dissipated, the officers could not reasonably believe that G recently had been the victim of an offense involving danger of forcible injury or reasonably believe that she had knowledge that may have

aided the officers' investigation about a recent or ongoing assault. Thus, this case is not sufficiently akin to *Fair* for us to conclude that the doctrine articulated in *Fair* would apply.[5]

Finally, the state argues that suppression is not warranted because the officers did not "trade on" or "take advantage of" their illegal presence to gain any of the challenged evidence as an alternative basis to affirm. A determination of whether the police exploited their unlawful conduct to obtain evidence "involve[s] a 'fact specific inquiry into the totality of the circumstances to determine the nature of the causal connection.'" *State v. Unger*, 356 Or 59, 79-80, 333 P3d 1009 (2014) (quoting *Hall*, 339 Or at 35). The state did not argue at trial, as it does now, that, even if the emergency had dissipated, the police did not exploit their illegal presence in G's and defendant's home because G did not ask them to leave, and therefore, none of the events relating to the discovery of the challenged evidence would have unfolded differently in the absence of the claimed illegality. The argument advanced by the state in its response to defendant's motion to suppress, and at the hearing on defendant's motion to suppress, never mentioned consent in relation to attenuation and focused solely on the theory of inevitable discovery as the means to purge the taint of any prior police illegality.

"[E]ven if the record contains evidence sufficient to support an alternative basis for affirmance," defendant "might have created a *different* record below had the [state] raised that issue" and the "record could affect the disposition of [that] issue." *Outdoor Media*, 331 Or at 660 (emphasis in original); *see also State v. Kimmons*, 271 Or App 592, 600, 352 P3d 68 (2015) (the state's officer safety alternative basis for affirmance was unreviewable when the state never advanced the alternative rationale to the trial court, and, if it had, the defendant might have created a different record below). Thus, because defendant could have sought to present additional facts or arguments about exploitation

---

[5] We also agree with the concurrence that even if a detention of G was justified under *Fair*, the officers' continued presence and search of the home required either a search warrant or a justified exception to that requirement.

and attenuation during the hearing on his motion to suppress, we will not consider that as an alternative basis for affirmance.[6]

In sum, the trial court did not err when it determined that the officers had an objectively reasonable belief that someone in defendant's home was in need of their immediate assistance and that the emergency had dissipated once Corning encountered G in the home. However, the trial court did err when it concluded that the inevitable discovery doctrine applied to allow the officers to remain in defendant's home and obtain the challenged evidence. Thus, the trial court erred when it failed to suppress evidence seized as a result of a warrantless search of defendant's home.

Reversed and remanded.

**HADLOCK, C. J.,** concurring.

I agree with the majority that police officers' warrantless entry into the home occupied by defendant and defendant's wife, G, was justified under the emergency aid doctrine. 276 Or App at 849. I also agree with the majority that the perceived emergency dissipated at the point when the officers saw that G had no visible serious physical injuries. 276 Or App at 850-51. But I disagree with the majority's conclusion that the officers could not constitutionally detain G as a "likely material witness" to a recent crime that involved a "danger of forcible injury." *See State v. Fair*, 353 Or 588, 609, 302 P3d 417 (2013) (describing circumstances under which "the stop and temporary on-the-scene detention of a likely material witness will be constitutional"). In my view, the facts here support application of the *Fair* material-witness exception. However, I would hold that—because the state did not argue that G consented to that detention occurring inside her house (instead of outside of the home, as was

---

[6] We do note that, *after* the court denied defendant's motion to suppress, defendant made a further argument on the record, to ensure it was preserved, that the Fourth Amendment would prohibit G from consenting as a co-occupant to the officers' entry after his refusal, arrest, and removal from the home. (Citing *Georgia v. Randolph*, 547 US 103, 126 S Ct 1515, 164 L Ed 2d 208 (2006)). However, we decline to address that issue because the state did not argue consent as an exception to the warrant requirement, or as a means to attenuate any prior illegality, to the trial court in the state's response or at the hearing on defendant's motion to suppress.

the case in *Fair*)—the state did not meet its burden of establishing that the officers' warrantless presence in the house did not violate defendant's rights under Article I, section 9, of the Oregon Constitution. Accordingly, I agree that the trial court erred in denying defendant's motion to suppress evidence that the officers discovered while they were in the home, but I reach that conclusion for reasons different from those expressed in the majority opinion.

As noted, my view of the lawfulness of the officers' actions departs from the majority's at the point at which a perceived emergency dissipated. The question then becomes whether—after the once-perceived emergency no longer existed—the officers had justification for remaining in the home that defendant and G occupied even though defendant had earlier objected to their entry. In my view, the officers still reasonably suspected that G was the victim of recent domestic assault. Accordingly, as I explain below, the officers could have remained in the couple's home to briefly investigate that suspected crime—even over defendant's earlier objection—had G consented to their continued presence.

*Fair* allows officers, under "appropriate circumstances," to detain a person "for on-the-scene questioning" when the officers "reasonably suspect [that the person] can provide material information about a crime's commission." 353 Or at 608. Broadly speaking, such a "temporary on-the-scene detention" will be constitutional if

"(1) the officer reasonably believes that an offense involving danger of forcible injury to a person recently has been committed nearby; (2) the officer reasonably believes that the person has knowledge that may aid the investigation of the suspected crime; and (3) the detention is reasonably necessary to obtain or verify the identity of the person, or to obtain an account of the crime."

*Id.* at 609.[1] In this case, defendant contends that *Fair* does not apply because the officers lacked reasonable suspicion that "an offense involving danger of forcible injury to a person recently has been committed nearby." Conversely, the

---

[1] *Fair* acknowledges that the factors set out above may bear "refinement * * * in future cases" involving factual situations different from those involved in that case. *Id.* at 609 & n 11.

state argues that the circumstances gave the officers at least reasonable suspicion that "defendant had assaulted or menaced his wife in the immediate or relatively recent past."

On that point, I agree with the state; that is, I agree that the trial court did not err when it ruled that the officers reasonably suspected "that some altercation occurred." My conclusion is based on the circumstances that the officers observed both before and after they entered the house. The officers arrived at defendant's home only a few minutes after getting a 9-1-1 report of screaming that was "mostly * * * male" and that may also have involved hitting. When they arrived, they could see (through a screen door) defendant sitting on a couch, with nobody else visible. Defendant, who was intoxicated, denied that anybody had been screaming and denied that anybody else was in the house. He refused to allow officers to enter. After one officer removed defendant, the other officer, who had remained in the living room of the home, called toward the back of the house, but got no response. Only after the officer started walking toward the back of the house, identifying himself as a police officer, did G emerge. G appeared to have been crying, and she seemed "shaken" and "frazzled" to the officer, who testified that, based on his training and experience, G's demeanor was consistent with being a victim of domestic violence.

In my view, those circumstances combined to give the officers at least reasonable suspicion that defendant had recently assaulted G. Put starkly, the officers had quickly responded to a 9-1-1 report of sounds consistent with a domestic assault, found an intoxicated man who denied that any such noise had occurred and tried to prevent officers from investigating further, then—after entering the house—discovered that the man had lied about nobody being inside, presumably because he did not want the officers to find G (who had, herself, apparently been trying to hide from the officers) in her shaken, frazzled, and crying condition. Even without considering the old bruises on G's arm, those circumstances could lead reasonable law enforcement officers, trained or experienced in investigating crimes of domestic violence, to reasonably suspect that defendant had recently

assaulted or menaced G. That is, the officers could reasonably suspect "that an offense involving danger of forcible injury to a person recently ha[d] been committed nearby." *Fair*, 353 Or at 609. I would also conclude that those circumstances allowed the officers to believe that G had knowledge that could assist them in investigating whether an assault had actually occurred, and that they needed to detain her to obtain an account of that crime. Consequently, I would conclude that the *Fair* exception would allow the officers to briefly detain G for that investigatory purpose.

As defendant points out, however, that conclusion would not end the inquiry. In *Fair*, the investigative detention occurred *outside* of the defendant's home. 353 Or at 590-91. Here, the officers' conversation with G occurred inside the house that she shared with defendant, after defendant had attempted to prevent the officers from entering the home and had, himself, been removed from it. The remaining question is whether, under those circumstances, the officers could temporarily detain G inside the home, instead of immediately leaving and asking her to come outside to talk with them.

In my view, the police officers in this case could have remained inside the home *if* G had consented to their presence, despite defendant's earlier objections to the officers' entry. That much is clear under the Fourth Amendment to the United States Constitution. True, the United States Supreme Court held in *Georgia v. Randolph*, 547 US 103, 122-23, 126 S Ct 1515, 164 L Ed 2d 208 (2006), that "a physically present inhabitant's express refusal of consent to a police search [of his home] is dispositive as to him, regardless of the consent of a fellow occupant." However, Justice Breyer, in concurrence, emphasized that the search at issue in *Randolph* "was a search solely for evidence" and that the "objecting party was present." *Id.* at 125-26 (Breyer, J., concurring). He opined that the *Randolph* analysis should not apply in other circumstances and stressed the need for a different approach in domestic-violence cases:

> "If a possible abuse victim invites a responding officer to enter a home or consents to the officer's entry request, that invitation (or consent) itself could reflect the victim's fear

about being left alone with an abuser. It could also indicate the availability of evidence, in the form of an immediate willingness to speak, that might not otherwise exist."

*Id.* at 127 (Breyer, J., concurring).

The theme of Justice Breyer's *Randolph* concurrence echoed in an opinion the Court issued several years later, *Fernandez v. California*, ___ US ___, 134 S Ct 1126, 188 L Ed 2d 25 (2014). In *Fernandez*, the Court addressed the lawfulness of police officers' entry into a home occupied by the defendant and his domestic partner, Rojas. The officers had gone to the apartment to investigate a report about a crime that had occurred elsewhere. The officers heard screaming and fighting coming from the apartment building. Rojas responded to the officers' knocking; she was injured, told the officers that she had been in a fight, and said (as it turns out, untruthfully) that she was the only adult present. The defendant then came to the door and told the officers that they could not enter the apartment. Suspecting that the defendant had caused Rojas's injuries, the officers removed him from the apartment, arrested him, and took him to the police station for booking. About an hour later, a detective returned to the apartment and obtained Rojas's consent to search the premises.

Under those circumstances, the Court held, *Randolph*'s holding that one inhabitant's "express refusal of consent to a police search [of his home] is dispositive as to him, regardless of the consent of a fellow occupant," 547 US at 122-23, did not apply. Indeed, the Court characterized *Randolph* as having "recognized a narrow exception" to the general principle that "consent by one resident of jointly occupied premises *is* generally sufficient to justify a warrantless search." *Fernandez*, ___ US at ___, 134 S Ct at 1130, 1133 (emphasis added). The Court emphasized that the *Randolph* exception applies only "to situations in which the objecting occupant is physically present." *Id.* at ___, 134 S Ct at 1130. In *Fernandez*, the defendant, who objected to the officers' entry, had been removed from the apartment before Rojas consented to the search; thus, he no longer was present. The Court found that distinction from *Randolph* significant because it transformed the situation into one in

which it was consistent with "'widely shared social expectations'" that one tenant of a residence may invite others into her home even when she knows that another tenant, who is *not* then present, might object. *Id.* at ___, 134 S Ct at 1135 (quoting *Randolph,* 547 US at 111).

Based largely on consideration of such societal norms, "practical problems" that would be caused by a different rule, and a focus on the rights of the person who *does* wish to consent to officers' search of his or her home, the Court concluded that the *Randolph* exception applies "only when the objector is standing in the door saying 'stay out' when officers propose to make a consent search." *Id.* at ___, 134 S Ct at 1135, 1136. Once the objector is no longer present, his or her previous objection does not remain effective for any length of time. *Id.* at ___, 134 S Ct at 1136. In other words, the previously present objector cannot effectively "register a continuing objection." *Id.* That is true even if police officers' actions led to the person's absence, so long as the officers' actions in removing the person were "objectively reasonable." *Id.* at ___, 134 S Ct at 1134.

*Fernandez* would govern the Fourth Amendment analysis here, had the state established that G consented to being questioned inside the couple's home. Before Officer Corning found G inside the house, another officer had removed defendant from the residence. At that point, defendant's earlier objections could not trump any consent that G might have given to the officers' continued presence in her house, once they discovered her inside. No Fourth Amendment violation would have occurred.

I would reach a similar conclusion under the rights-based analysis of Article I, section 9. That is, I would conclude that—had G consented to the officers' continued presence in her home for the purpose of investigating the suspected domestic assault—the officers could have remained, despite defendant's earlier objections to their entry. As a cotenant, G would have had actual authority to consent to the officers' presence in the home. *State v. Bonilla,* 358 Or 475, 481, 366 P3d 331 (2015) ("[A] co-inhabitant with common authority over property, based on joint access or control, generally has

authority to give consent to search the property.").[2] To hold that the earlier objections of defendant could trump such consent would be to diminish G's interests, as the Court observed in discussing similar circumstances in *Fernandez*:

> "Denying someone in [the victim's] position the right to allow the police to enter *her* home would also show disrespect for her independence. Having beaten [the victim], [the defendant] would bar her from controlling access to her own home until such time as he chose to relent. The Fourth Amendment does not give him that power."

___ US at ___, 134 S Ct at 1137 (emphasis in original). In my view, the principles underlying that statement apply equally to the analysis under Article I, section 9.[3]

Thus, I conclude that the officers reasonably suspected that G was a victim of recent domestic assault, and that she therefore *could have* authorized the officers' presence in her home for the purpose of investigating that crime under *Fair* and *Fernandez*, despite defendant's earlier objections to the officers' entry. But the state did not argue to the trial court that G consented, either implicitly or explicitly, to the officers' continued presence in the home, and the court made no such finding.[4]

Nonetheless, the state contends that the *Fair* rationale necessarily extends to material-witness detentions within the home, at least in the absence of an objection from the witness (here, G). But *Fair* dealt specifically with the

---

[2] I note that G's authority to consent to the officers' presence in the home for that purpose would not necessarily equate with authority to consent to their search of specific items or areas within it. *See State v. Fuller*, 158 Or App 501, 506, 976 P2d 1137 (1999) ("Whether a roommate can authorize the search of a particular area, or the effects within that area, depends on the extent of the roommate's use of, access to, and control of the premises, or effects therein[.]" (Internal quotation marks omitted.)).

[3] Whether one cotenant's consent to police officers' entry into a home generally can trump another *present* cotenant's objection to that entry is a complex question that will bear deeper examination in another case. "Oregon courts ha[d] not specifically adopted the bright-line rule announced in *Randolph*," *State v. Wynne*, 258 Or App 787, 792 n 3, 311 P3d 978, *rev den*, 354 Or 656 (2013), even before *Fernandez* clarified the narrowness of *Randolph*'s holding.

[4] As the state observes, the trial court did find that G did not object to the officers' presence. But that finding does not assist the state here, as mere acquiescence to police officers' actions does not equate to consent. *State v. Jepson*, 254 Or App 290, 294-95, 292 P3d 660 (2012).

legality of a detention that occurred outside of a home, not officers' presence inside a person's home in the absence of any authorized consent. Moreover, the court in *Fair* carefully distinguished warrantless seizures of persons from warrantless searches and seizures of premises and property. 353 Or at 604. Indeed, the court stressed that a warrantless arrest of a person can occur *only* outside of the home, absent an exigent circumstance, "because the warrantless seizure of the person who is in his or her private premises, and not in public, would run counter to the considerable body of law that has developed to protect an individual's belongings from unreasonable search and seizure in his home." *Id.* at 604-05 (internal quotation marks omitted).

In light of that body of law, referenced in *Fair*, I am not persuaded by the state's argument that the material-witness exception to the search warrant requirement extends so far as to allow police officers to detain a material witness in that person's home absent the person's consent to be questioned there, rather than in another location, and absent any exigency. Because the state did not prove that G consented to the officers' continued presence in her home, once the perceived emergency that justified their initial entry dissipated, the state did not establish that the warrantless search *of the house*—as opposed to the warrantless detention *of G*—was justified. Accordingly, I agree that the trial court erred when it denied defendant's motion to suppress, and I concur in the decision to reverse and remand the trial court's judgment.[5]

---

[5] Even in the absence of G's consent to their continued presence in her home, *Fair* would still allow the officers to detain G to investigate the suspected crime. However, I conclude that they would have had to do so outside of the house. I do not explore in this concurrence whether the officers would have had authority to order G to leave her home for purposes of the *Fair* detention, or would have had to rely on her cooperation in coming outside if they wanted to investigate immediately, without waiting to obtain a warrant.