Argued and submitted December 30, 2019, judgments in Case No. C140104CR and Case No. C112623CR reversed and remanded April 28, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

NATHAN DANIEL OXFORD,
*Defendant-Appellant.*

Washington County Circuit Court
C140104CR, C112623CR;
A167312 (Control), A167313

488 P3d 808

Defendant appeals a judgment of conviction for felon in possession of a firearm, ORS 166.270; unlawful possession of a destructive device, ORS 166.382; and unlawful possession of methamphetamine, ORS 475.894. Before trial, defendant moved to suppress evidence seized as a result of the search of his room, because the search and seizure violated his rights under Article I, section 9, of the Oregon Constitution. Specifically, defendant argued that the scope of consent for which he permitted officers to enter his premises was limited to the purpose of aiding his roommate's medical emergency. Defendant further argued that the Westside Interagency Narcotics (WIN) team exceeded the scope of his consent when they entered his premises for the purpose of conducting a criminal investigation. The trial court denied defendant's motion to suppress, after which defendant was convicted of the charged crimes. Based on those convictions, the court also revoked defendant's probation in another case. Defendant appeals both the judgment of conviction in Case No. C140104CR and the probation revocation judgment in Case No. C112623CR. *Held*: The trial court erred in denying defendant's motion to suppress because the WIN team's entry for the purpose of a criminal investigation exceeded the scope of defendant's consent. Accordingly, the court erred in revoking defendant's probation.

Judgments in Case No. C140104CR and Case No. C112623CR reversed and remanded.

James Lee Fun, Jr., Judge.

Erik Blumenthal, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellant Section, Office of Public Defense Services.

Rolf C. Moan, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Armstrong, Presiding Judge, and Egan, Chief Judge, and Kistler, Senior Judge.

EGAN, C. J.

Judgments in Case No. C140104CR and Case No. C112623CR reversed and remanded.

**EGAN, C. J.**

Defendant was charged with felon in possession of a firearm, ORS 166.270; unlawful possession of a destructive device, ORS 166.382; and unlawful possession of methamphetamine, ORS 475.894, after deputies searched defendant's bedroom and seized various personal effects. Defendant challenged that search and seizure as unlawful, arguing that it violated Article I, section 9, of the Oregon Constitution. The trial court denied defendant's motion to suppress, after which defendant was found guilty of those charges at a bench trial. Based on those criminal convictions, the court also revoked defendant's probation in another case. Defendant appeals both the judgment of conviction, in Case No. C140104CR, and the probation revocation judgment, in Case No. C112623CR. We conclude that the court erred in denying defendant's motion to suppress. Accordingly, we reverse and remand the judgments in Case No. C140104CR and in Case No. C112623CR.

In reviewing the denial of a motion to suppress, "we are bound by a trial court's factual findings, if the record contains evidence to support them." *State v. Serrano*, 346 Or 311, 326, 210 P3d 892 (2009). If the court failed to articulate a factual finding on a pertinent issue, we assume that the court decided the facts "in a manner consistent with the court's ultimate conclusions, as long as there is evidence in the record, and inferences that reasonably may be drawn from that evidence," that would support its conclusion. *State v. Juarez-Godinez*, 326 Or 1, 7, 942 P2d 772 (1997). When a court finds that police conduct was authorized by a defendant's consent, we are bound by that finding if it is supported by "constitutionally sufficient evidence." *State v. Blair*, 361 Or 527, 537-38, 396 P3d 908 (2017). We state the facts in light of those standards.

On January 13, 2014, at 5:59 p.m., defendant called 9-1-1 because his roommate, Titus, had overdosed on Fentanyl, causing him to suffer cardiac arrest. Defendant spoke with the 9-1-1 operator for a moment to provide general information before telling the operator that he was going to put the phone down to perform CPR on Titus. After defendant put the phone down, Titus's girlfriend, Cox, picked up

the phone and began speaking with the operator. Cox put the phone on speakerphone so that the operator could provide CPR instructions to defendant. The operator also told Cox to have the door unlocked because "[t]here's an officer almost there to help you." Defendant stated "Yes, ma'am" before telling the operator that Titus was turning blue. In response, the operator told defendant to keep performing CPR until an officer arrived. Three minutes after defendant called 9-1-1 at 6:02 p.m., Deputy Roley arrived for the purpose of aiding "someone who was in medical distress."

When Roley arrived, Cox invited Roley to "the back bedroom" where defendant and Titus were located. Roley then took over performing CPR. Roley noticed that "there was drug paraphernalia and what appeared to be drugs visible on the dresser" in Titus's bedroom. Paramedics arrived approximately four minutes after Roley, and they took over all lifesaving efforts from him in an attempt to further stabilize Titus. After Roley was relieved of his responsibility to perform CPR, he turned his efforts to determining what Titus "might have consumed, and when he might have consumed them" because that information is "critical in a drug overdose case in order to inform medical personnel." Additionally, Roley contacted the Westside Interagency Narcotics (WIN) team and requested that the team begin a so-called "Len Bias investigation" based on the observations Roley made of the paraphernalia and drugs he saw in Titus's bedroom.[1] During that conversation, Roley conveyed to the WIN team that "[t]he expectation was it was unlikely that [Titus] would survive."

At approximately 6:26 p.m., the paramedics moved Titus from the apartment to a nearby hospital. Around that

---

[1] A "Len Bias investigation" is a reference to an investigation based on one of the provisions of 21 USC section 841, enacted after the overdose death in 1986 of Len Bias, a college basketball player from the University of Maryland who had been drafted by the Boston Celtics just two days before his death. Len Bias overdosed on powder cocaine, and in response, the United States Congress enacted additional provisions of 21 USC section 841 to, in part, make it possible to charge and convict a person under federal law for the sale of a controlled substance when "death or serious bodily injury results from the use of such substance." Jon Schuppe, 30 Years after Basketball Star Len Bias' Death, Its Drug War Impact Endures, NBC News (June 19, 2016), https://www.nbcnews.com/news/us-news/30-years-after-basketball-star-len-bias-death-its-drug-n593731.

time, "[e]ither just before or just after *** Titus was taken to the hospital," deputies Gerba and Coplin arrived. Gerba continued the investigation after Titus was taken to the hospital and attempted "to get information regarding the types of drugs that [Titus] may have consumed, when he might have used them, and where he got them from." After Titus was removed, some paramedics remained at the apartment to gather equipment.

While the paramedics were gathering their equipment, Roley began asking defendant and Cox questions about what happened to Titus. Both defendant and Cox stated that Titus had taken Fentanyl. At about the time the paramedics were leaving, roughly 7:00 p.m., three more sheriff's deputies arrived—Roque, Ferraris, and Pelletteri—as a part of the WIN team.

Once the WIN team arrived, the deputies began investigating, requesting defendant's consent to search defendant's bedroom. At first, defendant was hesitant to have his room searched. After Ferraris explained to defendant that the officers were trying to "eliminate [defendant] as a contributor" to the overdose, defendant replied that he "did not want to go back to prison." Pelletteri asked defendant why he would go back to prison, and defendant admitted to having a "firearm in his bedroom and that he was a convicted felon." Pelletteri read defendant his *Miranda* rights after defendant made that admission, and then again asked defendant to consent to a search of his bedroom; defendant consented.

Pelletteri searched defendant's room and found a "square glass dish" with "white powder residue," a handgun, and a "black device with red wiring coming out" of it. Defendant eventually admitted that the white substance was methamphetamine, and it later tested positive for methamphetamine by way of a "field test." Defendant also admitted that the black device was a "homemade explosive device containing a rocket igniter." The Portland Police Bureau's Bomb Squad was requested to assist, and the squad destroyed the device at a safe location. Roley and the other deputies did not leave the premises until 9:18 p.m.

Defendant was arrested and later indicted for felon in possession of a firearm, unlawful possession of a destructive device, and unlawful possession of methamphetamine.

Before trial, defendant moved to suppress evidence seized as a result of the search of his room, because the search and seizure violated Article I, section 9. In response, the state argued that the 9-1-1 call constituted consent for police to enter and that the emergency-aid exception, probable cause for a Len Bias investigation, and community-caretaking provided constitutional justification for them to remain. Defendant admitted that he consented to "Roley being in" his premises for the purpose of "medical aid," but he contended that the emergency-aid basis for police to be in the apartment had dissipated by the time the WIN team arrived.

The trial court concluded that

"there is no question that the entry into the residence was accomplished pursuant to the so-called Emergency Aid Doctrine. Now, that Emergency Aid Doctrine in this circumstance is part and parcel, at least in [the court's] view, can be distinguished from the concept of consent.

"I know that the attorneys are treating those concepts separately and I suppose they are separate legal concepts, but I don't think there is any way to describe the facts other than one in which Ms. Cox and defendant invited the officers into the residence by reason of the call to 911 regarding [Titus's] overdose."

The court specifically concluded that Roley, Gerba, and Coplin entered "the residence for the purposes of rendering emergency aid or the consent that was given to enter was not revoked." Likewise, the court found that the WIN team entered defendant's premises in accordance with defendant's consent to obtain emergency aid, because the "right to be in the house was not revoked," but that the WIN team specifically entered "for the purposes of a so-called Len Bias investigation." The court continued:

"Certainly, I would agree that the facts demonstrate that at some point the emergency aid function that the police officers were there to perform and the investigation

into the so-called Len Bias crime overlap. I don't think there's any question about that. And that is true.

"But it does not mean at the same time that the officers' care-taking and emergency function evaporates. They are certainly obligated to gather as much information as is possible to provide to either the doctor or the medical examiner information regarding the cause of death or the cause of the injury."

The court denied defendant's motion to suppress.

After the trial court ruled on the motion to suppress, defendant agreed to a bench trial based on the evidence from the suppression hearing, and the trial court found defendant guilty on all three charges. Based on those convictions, the court also revoked defendant's probation.

On appeal, defendant argues that the trial court erred by denying his motion to suppress, because the evidence was collected in violation of his Article I, section 9, right to be free from unlawful search and seizure. Defendant acknowledges that he consented to the presence of "police and other first-responders to enter the apartment to administer medical aid," but argues that the scope of defendant's consent did not extend to police entering for purely investigative purposes, and that his consent for emergency-aid purposes had terminated by the time the WIN team—Ferraris, Pelletteri, and Roque—arrived, because Titus was no longer present and in need of aid. Defendant further argues that, once the WIN team was in his apartment, the deputies exploited their unlawful presence to obtain consent to search his room. The state responds that the "sole issue" we must address is whether defendant consented to the WIN team entering defendant's premises.

We review a trial court's denial of a motion to suppress for legal error. *State v. Perryman*, 275 Or App 631, 636, 365 P3d 628 (2015).

Article I, section 9, prohibits a warrantless search unless a recognized warrant exception justifies it. *State v. Paulson*, 313 Or 346, 351, 833 P2d 1278 (1992). Consent is one such exception. *State v. Zamora*, 237 Or App 514, 518, 240 P3d 91 (2010), *rev den*, 350 Or 297 (2011). When the

state relies on consent to support a search, it must prove by a preponderance of the evidence that the police officer conducting the search complied with any limitation on the scope of a defendant's consent. *State v. Lamoreux*, 271 Or App 757, 760, 354 P3d 717 (2015).

In *Blair*, the Supreme Court clarified that, when "determining whether a particular search falls within the scope of a defendant's consent, the trial court will determine, based on the totality of circumstances, what the defendant actually intended. That determination is a factual one." 361 Or at 537. In determining the scope of a defendant's consent, "what a person says is often the best indicator of what the person intended." *Id*. Furthermore, "when officers requesting consent make clear to a suspect what the objects of the requested search are and what level of scrutiny is sought," that helps to further clarify the defendant's intent. *Id*. at 538.

Consent to enter premises can be limited in a variety of ways. *State v. Binner*, 131 Or App 677, 680, 886 P2d 1056 (1994). In *State v. Allen*, 112 Or App 70, 74, 826 P2d 127, *rev den*, 314 Or 176 (1992), we said that "consent to search may be confined in scope to specific items, restricted to certain areas or limited in purpose or time." As relevant here, defendant argues that the scope of his consent was limited in its purpose. Specifically, defendant argues that he only "authorized police and other first-responders to enter the apartment to administer medical aid."

Neither party disputes, and we agree, that the WIN team entered defendant's premises "for the purposes of a so-called Len Bias investigation." The state argues that the trial court found that the WIN team also entered for the purpose of gathering "as much information as is possible to provide to either the doctor or the medical examiner regarding the cause of death or the cause of injury."[2] But the trial

---

[2] The state also argues that defendant not only consented to emergency personnel's entry "for the purpose of providing hands-on medical assistance to Titus, but for the additional purpose of determining what was causing Titus's medical crisis." Given the disposition of our case, we need not address this argument because, even assuming, without deciding, that the scope of defendant's initial consent to enter encompassed the additional purpose of determining what was causing Titus's medical crisis, we nevertheless conclude that the WIN team entered unlawfully.

court did not find that the WIN team entered for the "purpose" of gathering information. Rather, the court found that the WIN team had an incidental "obligat[ion]" to provide pertinent information to the doctor or medical examiner regarding Titus's medical crisis.[3]

Although we disagree with the state's description of the trial court's finding regarding the WIN team's purpose in entering, that does not address the scope of defendant's intended consent. The question is whether defendant's consent extended to the WIN team's entry for the "purposes of a Len Bias investigation," or the incidental "obligation" to inform medical personnel of relevant information concerning Titus's medical condition.

The record supports the trial court's finding that "defendant invited the officers into the residence" for the purpose of rendering emergency aid "regarding [Titus's] overdose." Defendant's words and the circumstances surrounding defendant's initial consent to enter defendant's premises support that conclusion. *See Blair*, 361 Or at 537-38 (stating that "what a person says" and "what the objects of the requested search are and what level of scrutiny is sought" by an officer are what we look at in determining defendant's actual intent). Defendant called 9-1-1 because Titus went into cardiac arrest. When the operator told defendant and Cox to leave the door unlocked, it was because "[t]here's an officer almost there to *help* you." Also, at the same time, defendant was telling the operator that Titus was turning blue. The conversation and surrounding circumstances

---

[3] During oral argument, the state argued that the trial court had concluded that the WIN team's incidental obligation to aid medical personnel should also be understood as a finding that the team had a dual purpose when entering. The state argued that it was inherent in a Len Bias investigation to determine what substances were used, and that that information would be helpful to medical personnel. However, we do not agree with the state's understanding of the trial court's finding. Rather, the trial court explicitly stated: The WIN team entered defendant's premises "for the purposes of a so-called Len Bias investigation." We agree with the state that the criminal investigation could locate information that is helpful to medical personnel, but, on this record, there is no evidence from which the trial court could have found that when the WIN team entered, the deputies had anything other than a criminal investigatory purpose, with the incidental effect of perhaps turning up medically useful information. A finding that the team had a dual purpose would not be supported by sufficient evidence; we cannot infer that the trial court made that finding.

support the court's finding that defendant's intent was to allow emergency personnel, including officers, to enter his premises to provide lifesaving assistance to Titus. Although the scope of that consent could have included investigation relating to that assistance, the WIN team's investigation exceeded that scope of consent.

"[T]he scope of the consent defines the scope of the intrusion." *State v. Wyman*, 59 Or App 542, 545, 651 P2d 195 (1982). For instance, consent to enter does not necessarily mean that a defendant has consented to a search. *Id*. Nor does consent to enter premises to administer emergency aid necessarily give an officer consent to remain or reenter the premises once that function has ceased. *See State v. Will*, 131 Or App 498, 503-04, 885 P2d 715 (1994) (discussing an officer's authority to remain or reenter under ORS 133.033, which permits peace officers to perform reasonably necessary community-caretaking functions). Accordingly, an initial consent to enter for one purpose does not extend the consent to a different purpose. A fact-specific inquiry is required to determine the scope of a defendant's consent. *Blair*, 361 Or at 537.

As we have concluded that the scope of defendant's consent was for the limited purpose of administering medical aid to Titus, we conclude that the WIN team's entry for the purpose of conducting a criminal investigation exceeded that scope. Just as consent to administer emergency aid does not necessarily give an officer consent to remain or reenter premises once that function has ceased, *Will*, 131 Or App at 503, consent to enter initially for one purpose does not mean that different officers can enter for a different purpose. We conclude that defendant's consent to Roley's entry to administer medical aid did not extend to the WIN team's entry for the purpose of a criminal investigation. We conclude, therefore, that the trial court erred in relying on defendant's consent for Roley's entry and remaining on the premises as consent to the WIN team's entry for criminal investigative purposes.

We next address whether the incidental "obligation" to turn over information to a medical provider was within the scope of defendant's consent. It was not. Although the

trial court found that the WIN team maintained some obligation to aid Titus if the deputies' criminal investigation turned up medically helpful information, that obligation, under these facts, was too remote to be within the medical purpose for which defendant consented.

Specifically, on the issue of arriving for a medical purpose, *State v. Garcia*, 276 Or App 838, 370 P3d 512 (2016), is instructive. In *Garcia*, we stated that determining whether an "emergency dissipated" requires an inquiry into whether "the circumstances present grounds for an officer to reasonably believe that immediate police action is [still] required." *Id.* at 849-50 (brackets in original; quotation marks omitted). As defendant consented for deputies to enter his premises for the purposes of medical aid, whether it would have been reasonably understood that police action was still required for that purpose is helpful in determining whether the WIN team entered lawfully.

Here, the WIN team did not arrive until about one-half hour after emergency personnel had already taken Titus to the hospital, and about the same time that paramedics were leaving after collecting their equipment. Defendant and Cox had already discussed with Roley, Gerba, and Coplin that defendant had taken Fentanyl, and there was no evidence that that information had proved inaccurate, or otherwise required further investigation for medical purposes. Although the trial court found that the WIN team entered, at least in part, for the obligation of gathering medical information in conducting the Len Bias investigation, the record does not support a conclusion that the WIN team entered for a medical purpose, and any incidental obligation, in this case, is too remote to be within the scope of the medical purpose for which defendant had given officers consent to enter his premises. Accordingly, the trial court erred in concluding that the WIN team entered defendant's premises with defendant's consent.

Because we conclude that the WIN team did not have defendant's consent to enter, they entered unlawfully. The remaining question is the appropriate remedy. Defendant argues that suppression is the proper remedy, because "the police exploited their illegal conduct to obtain the consent to

search." The state requests that we remand the case so that the trial court can fully address arguments regarding suppression that the trial court did not reach. We agree with the state that remand is appropriate so that the trial court can address the state's additional arguments opposing the motion to suppress, which the trial court did not reach. A remand for further proceedings on the motion to suppress is therefore required. *See State v. Wise*, 305 Or 78, 82 n 2, 749 P2d 1179 (1988) ("the Court of Appeals should not hesitate to send cases back to the trial courts" for necessary findings on motions to suppress); *see State v. Nelson*, 181 Or App 593, 605, 47 P3d 521, *rev den*, 335 Or 90 (2002) (concluding that when alternative bases for granting or denying a motion to suppress turn on factfinding by the trial court, the case should be remanded).

Therefore, Case No. C140104CR is reversed and remanded for further proceedings. Defendant contends that that disposition also compels that we reverse his probation revocation. We agree and reverse the judgment in Case No. C112623CR revoking defendant's probation.

Judgments in Case No. C140104CR and Case No. C112623CR reversed and remanded.