Argued and submitted December 19, 2016, reversed and remanded May 3, 2017

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## JASON DAVID HAMILTON,
*Defendant-Appellant.*

Multnomah County Circuit Court
130532458; A158022

397 P3d 61

Kali Montague, Deputy Public Defender, argued the cause for appellant. With her on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Jamie K. Contreras, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Shorr, Judge.

**SHORR, J.**

Defendant appeals a judgment convicting him of unlawful delivery of marijuana. ORS 475.860 (2013), *amended by* Or Laws 2015, ch 1, § 78; Or Laws 2015, ch 614, § 122; Or Laws 2016, ch 24, § 44. On appeal, defendant assigns error to the trial court's denial of his motion to suppress evidence discovered after police conducted a warrantless search of defendant's home after removing defendant and his roommate from the house. Officers searched defendant's home for potential victims of an assault after responding to a 9-1-1 call from defendant's roommate. In that call, the roommate told officers that he was in a dispute with defendant and that defendant was threatening to kill him. After the officers entered defendant's home and removed defendant and his roommate, the officers searched the home to determine if any potential victims of an assault remained. Defendant contends that the trial court mistakenly concluded that the officers' warrantless search of his home after defendant and his roommate were removed was justified under the emergency aid exception to Article I, section 9, of the Oregon Constitution. We agree with defendant and, accordingly, reverse and remand.

We are bound by the trial court's findings of historical fact that are supported by constitutionally sufficient evidence. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). Further, "[i]n the absence of express factual findings, we presume that the trial court decided the disputed facts in keeping with its ultimate conclusion." *State v. Garcia*, 276 Or App 838, 839, 370 P3d 512 (2016). With that standard of review in mind, we state the following facts.

Police officers were called to defendant's house to respond to a disturbance between defendant and his roommate. Officer Sapper, the first officer to arrive, was told by dispatch that a caller and his roommate (later determined to be defendant) were arguing and that defendant was threatening to kill the caller. Because of the volatility of the situation, Sapper chose to wait for back-up when he arrived, rather than enter the house alone. While he was waiting for additional officers to arrive, Sapper monitored the house. While waiting, Sapper could hear crashing noises

and defendant screaming, "Get the fuck out of my house." However, Sapper did not hear any verbal threats of physical harm. Sapper could also see into the house. From his vantage point, he could see a number of objects that were broken on the floor and defendant walking through the house. Sapper could not tell how many people were in the house, however. As he made those observations, dispatch informed Sapper that the caller was now locked in his bedroom, armed with a baseball bat.

While Sapper was waiting for additional officers, dispatch was also in contact with Officer Ellis. Dispatch initially told Ellis that the dispute was between a man and a woman and that there was a lot of screaming in the background of the call. As Ellis traveled toward the house, defendant's roommate, the caller, came on the line with Ellis and said that he was in a fight with one of his roommates, that he had barricaded himself in his bedroom with a baseball bat, and that he was preparing to defend himself. Ellis also noted that, while he was talking to defendant's roommate, there was a lot of screaming in the background.

Eventually, additional officers arrived at the scene. Sapper and the newly arrived officers approached defendant's door and stood on the porch, planning what to do. While on the porch, Sapper heard additional crashing noises and what he believed was the sound of a person kicking in a door. Based on those noises and the knowledge that the caller had acquired a bat to defend himself, the officers entered the house through the unlocked front door.

As the officers entered the house, defendant walked toward them with a large kitchen knife in his hand. Sapper pointed his pistol at defendant and told him to drop the knife. Defendant complied. Officers then handcuffed defendant and asked him if there was anyone else in the house. Defendant responded, "No. It's my house. You can't go in." Sapper then removed defendant from the house.

At that point, Sapper was still uncertain how many people were in the house, but "assumed there was at least one other person based off of what dispatch had told [him], that there was a man in a room armed with a bat." Similarly, Ellis also "assumed there was at least one more [person in

the house]" but also noted that "you never know who else or how many other people are in [a] house." Sapper could also hear at least one more person in the house. Sapper called out, ordering whoever was in the house to come out with their hands up. Defendant's roommate complied. Sapper asked the roommate if he knew if anyone else was in the house, and the roommate responded, "I don't know." One of the other officers then removed the roommate from the house. At that point, Sapper was "not a hundred percent" certain that the person that they had removed was the caller; however, he "assumed it was."

After the roommate was removed, the officers called out to see if anyone else was in the home. No one responded, and the officers did not hear any other noises that suggested that anyone else remained in the house. However, rather than leave, the remaining officers proceeded to search the house for potential unconscious or dead participants from the earlier dispute. At no point before or during their search did the officers find any signs of personal physical injury, such as blood, in the house. They did notice what they perceived to be knife slashes on the doorjamb of the door behind which defendant's roommate had been locked.

After clearing the rest of the house, Sapper and Ellis decided to search defendant's basement. In the basement, the officers discovered a large number of marijuana plants. After finding the marijuana plants, officers continued to search the basement for any unconscious or dead disputants. Finding none, the officers contacted the Drugs and Vice Division to report their discovery of the marijuana.

Based on the officers' discovery of the marijuana during their warrantless search, defendant was indicted for unlawful delivery of marijuana and other charges. Defendant moved to suppress all evidence that the officers found as a result of the warrantless search of his home that took place after defendant and his roommate had been removed.

At the suppression hearing, only two of the responding officers testified, Sapper and Ellis. Both officers testified as to their state of mind at the time they decided to continue their search, after defendant and his roommate were removed from the house. Sapper stated that he believed

that the continued search was necessary "[t]o determine if there's anybody in the house that's injured." Similarly, Ellis testified that he believed that continuing the search was necessary "to find potential victims, to see if anybody else was in the home, if anybody was hurt, if they needed aid." Importantly, the officers did not testify that they believed that a potentially injured victim remained in the home after they removed defendant's roommate. Instead, Ellis testified that he merely speculated that more people could have been in the house because "you never know who else or how many other people are in the home."

Based on Sapper's and Ellis's testimony, the state argued against suppression of the evidence of marijuana found in the basement, claiming that the officers' continuing search was justified, even after the removal of defendant and his roommate, under the emergency aid exception to the warrant requirement. In response, defendant argued, as he does on appeal, that, once defendant and his roommate were removed from the home, the officers lacked both a subjective and objectively reasonable belief that anyone else remained in the house who required emergency aid. The trial court agreed with the state and denied defendant's motion to suppress. After the court's initial denial, defendant filed a renewed motion to suppress. The court denied defendant's renewed motion as well.

Defendant eventually pleaded guilty to one count of unlawful delivery of marijuana. In his plea petition, defendant reserved the right to appeal the trial court's orders denying his motion to suppress and his renewed motion to suppress. *See* ORS 135.335(3) (providing for conditional pleas). This appeal followed.

Before us, defendant argues that the trial court erred in denying his suppression motion. Defendant asserts that the record does not support the trial court's conclusion that the emergency aid exception to the warrant requirement applied in this case. Specifically, defendant argues that the record lacks sufficient evidence that officers had the subjective belief necessary to justify continuing their search of his home after he and his roommate were removed from it and that, even if they did have that belief, the trial

court erred in concluding that such a belief was objectively reasonable. The state disagrees, arguing that the trial court was correct in concluding that the emergency aid exception applies in this case. As noted, we agree with defendant and, accordingly, reverse and remand.

We review a trial court's decision to deny a motion to suppress for errors of law. *Ehly*, 317 Or at 75. "Under Article I, section 9, warrantless entries and searches of premises are *per se* unreasonable unless falling within one of the few 'specifically established and well-delineated exceptions' to the warrant requirement." *State v. Baker*, 350 Or 641, 647, 260 P3d 476 (2011) (quoting *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983)). One such exception is the emergency aid exception defined in *Baker*:

> "[A]n emergency aid exception to the Article I, section 9 warrant requirement is justified when police officers have an objectively reasonable belief, based on articulable facts, that a warrantless entry is necessary to either render immediate aid to persons, or to assist persons who have suffered, or who are imminently threatened with suffering, serious physical injury or harm."

*Id.* at 649 (footnotes omitted). Under *Baker*, to satisfy the emergency aid exception, the state must prove both that, at the time of the warrantless search, the searching officers had the subjective belief "that there was an immediate need to aid or assist a person who has suffered (or is imminently threatened with suffering) serious physical injury or harm" and that that "belief [was] objectively reasonable." *State v. McCullough*, 264 Or App 496, 502-03, 336 P3d 6 (2014).[1]

We begin by noting that defendant concedes, as he did below, that the officers' initial entry into his home was justified by the emergency aid exception to the Article I, section 9, warrant requirement. Defendant argues only that the officers' continued search of his home *after* he and his

---

[1] Before the Supreme Court's decision in *Baker*, this court applied the emergency aid exception using the four-element test we established in *State v. Follett*, 115 Or App 672, 680, 840 P2d 1298 (1992), *rev den*, 317 Or 163 (1993). As we noted in *McCullough*, "some aspects of *Follett* remain" following *Baker*. 264 Or App at 502. Those aspects include our previous holdings that "the emergency aid exception applies only when an officer has a belief that there is an immediate need to aid or assist a person, and that belief is objectively reasonable." *Id.*

roommate were removed was not justified under that exception. *See State v. Bistrika*, 262 Or App 385, 393, 324 P3d 584, *rev den*, 356 Or 397 (2014), *cert den*, ___ US ___, 136 S Ct 32 (2015) (noting that, when an emergency justifying a search under the emergency aid exception has dissipated, the searching officers are no longer authorized to remain on the searched property under that exception). Turning to that continued search, as we discuss below, the record contains no evidence that the officers had the subjective belief necessary for the emergency aid exception to apply.

Determining an officer's subjective belief is a question of fact. *State v. McDonald*, 168 Or App 452, 459, 7 P3d 617, *rev den*, 331 Or 193 (2000). As we noted above, we are bound by the trial court's findings of historical fact that are supported by constitutionally sufficient evidence in the record. *Ehly*, 317 Or at 75. Further, "[i]n the absence of express factual findings, we presume that the trial court decided the disputed facts in keeping with its ultimate conclusion." *Garcia*, 276 Or App at 839. In this case, the trial court never explicitly ruled that the officers had a subjective belief that their continued search of defendant's property after defendant and his roommate were removed was necessary to provide immediate aid or assistance to a person who was suffering from, or imminently threatened with suffering, a serious physical injury or harm. However, the court implicitly made that finding when it concluded that the officers' search was justified by the emergency aid exception. *Id.* That finding is not supported by constitutionally sufficient evidence in the record. Instead, the record supports only a determination that the officers continued to search defendant's home with the belief that their search was necessary to *discover if* someone was in the house and, in that case, to *discover if* that person had suffered a serious physical injury or harm that required immediate aid or assistance.

The subjective belief required for the emergency aid exception to apply is the belief that a search is necessary because there is "an immediate need to aid or assist a person who has suffered (or is imminently threatened with suffering) serious physical injury or harm," not the belief that a search is necessary *to discover if* there is an immediate need to aid or assist a seriously injured person. *See McCullough*,

264 Or App at 503-04 ("[The officer] testified consistently that his intention [in entering a home] was *to make sure that defendant was okay* and to check on his well-being. * * * [T]hat may reveal well-founded speculation that perhaps not all was well with defendant, but it falls short of evincing that [the officer] believed *that his intervention was necessary to protect defendant* from the effects of serious physical injury or harm." (Emphases added.)).

The belief that a person who is seriously physically injured (or imminently threatened with suffering serious physical injury) and requires immediate aid actually exists, as opposed to the belief that such a person possibly could exist, "is significant because whether an emergency exists depends on whether immediate action is required (something that will alleviate the emergency), which, in turn, depends on the relationship between the gravity of the harm to be prevented and the probability that the harm will occur if action is not taken." *State v. Burdick*, 209 Or App 575, 581, 149 P3d 190 (2006) (internal quotation marks omitted). If officers believe only that a search is necessary to discover if there is a person in the location who needs immediate aid, rather than that the search was necessary because a person who is seriously injured needs their aid, officers are acting with a "purely speculative" belief that there is a "risk and gravity of harm" requiring their immediate action. *Id.* at 582. A speculative belief that someone might require aid does not justify a warrantless search under the emergency aid exception. *McCullough*, 264 Or App at 504.

Our reasoning in *McCullough* further illuminates that distinction. In *McCullough*, an officer was dispatched to investigate the defendant's truck, which was parked facing the wrong direction on a highway. *Id.* at 497. When the officer arrived at the scene, he determined that the truck had been traveling in the correct direction on the highway before it drifted into the oncoming lane, hit a pile of large rocks on the shoulder, "flipped around a little bit," and came to a rest facing west. *Id.* (internal quotation marks omitted). The officer noticed "blood droplets and spattering in and around the pickup truck," but could not find the driver. *Id.* at 497-98 (internal quotation marks omitted). Based on that information, the officer testified that he knew "that there had been

a crash, someone had been hurt, and [his] job [was] to make sure that person [was] okay." *Id.* at 498 (internal quotation marks omitted).

The officer then drove to the defendant's trailer. *Id.* As he approached the trailer, he saw more drops of blood, and, through a window next to the door, the officer could see blood splatters in the trailer's entryway as well as "a rag smeared with blood on the floor." *Id.* The officer knocked on the trailer's door several times and announced that he was a police officer; however, no one responded. *Id.* At that point, the officer testified that he believed that he "needed to make sure that the person [who] was in the wreck was okay and to check on their well-being." *Id.* (brackets in original; internal quotation marks omitted). Based on that belief, the officer opened the trailer door and went inside. *Id.*

Based on those facts, we held that "the record [did] not include any evidence that could support the conclusion that [the officer] had [the] subjective belief" that "there was an immediate need to aid or assist a person who [had] suffered (or [was] imminently threatened with suffering) serious physical injury or harm." *Id.* at 503. We noted that, "although there [was] evidence that [the officer] believed that defendant had been hurt, there [was] no evidence that, before he entered defendant's trailer, [the officer] believed that his entry was necessary to render immediate aid or assistance to defendant." *Id.* Instead, we found that the officer "believed all that was necessary was to 'make sure that [defendant] was okay' and 'to check on [his] wellbeing.'" *Id.* (brackets in original). As a result, we held that, although the officer's intention "to make sure that defendant was okay and to check on his well-being * * * reveal[ed] well-founded speculation that perhaps not all was well with defendant, * * * it [fell] short of evincing that [the officer] believed that his intervention was necessary to protect defendant from the effects of serious physical injury or harm." *Id.* at 504.

In this case, we begin by noting that no one disputes—and there is no evidence in the record indicating—that the officers believed that anyone remaining in the house after defendant and his roommate were removed required their immediate assistance because they were "imminently

threatened with suffering[] serious physical injury or harm." *Baker*, 350 Or at 649. Consequently, we examine whether the officers believed that, at the time of their search, their continued search was necessary to provide immediate aid or assistance to a person who had *actually* suffered serious physical injury or harm. *Id.* Like in *McCullough*, the record in this case fails to present any evidence that the officers believed that their "intervention was necessary to protect [a person] from the effects of a serious physical injury or harm" at the time of the disputed search. Only two officers involved in the search, Sapper and Ellis, testified at defendant's suppression hearing. The officers did not testify that they were in the house based on a belief that they needed to continue to search the home *because* a person who had suffered a serious physical injury required their immediate aid or assistance. Instead, both officers testified that they continued to search the home to discover if there was anyone else in the home who needed immediate aid. At the suppression hearing, Sapper testified that his reason for searching defendant's house after defendant and his roommate had been removed was "*[t]o determine if* there's anybody in the house [who's] injured." (Emphasis added.) Similarly, Ellis testified that the purpose of the search was to find out *if* anyone else was in the house, and, if they were, to determine *if* that person needed aid. Ellis stated he was searching in an attempt "*to see if* anybody else was in the home, *if* anybody was hurt, *if* they needed aid." (Emphases added.)

Those statements of intent, like the officer's statement in *McCullough* that he entered the house to "make sure that defendant was okay" and to "check on [his] well-being," were not statements that they believed their continuing search of the home was necessary *because* someone was suffering from a serious physical injury and required their immediate aid. Instead, the officers' statements indicate that, at best, they were uncertain if another person was located in the house and, further, that, if that person were in fact present, they were uncertain whether that person would be seriously physically injured.

Consequently, as in *McCullough*, although the officers' belief that the continued search of defendant's home

was necessary *"[t]o determine if* there's anybody in the house that's injured" reveals "well-founded speculation that perhaps" there was another person in the house and that perhaps that person was injured, that belief falls "short of evincing that [the officers] believed that [their] intervention was necessary to protect [a person] from the effects of serious physical injury or harm." 264 Or App at 505 (emphasis added). As a result, like the officer in *McCullough*, the officers in this case lacked the subjective belief necessary at the time of their search to avail themselves of the emergency aid exception to the Article I, section 9, warrant requirement.

The remaining evidence in the record does not contradict our conclusion. The trial court may have inferred, based on a number of facts in the record, that the officers had the belief—not articulated by Sapper and Ellis at the suppression hearing—that, after defendant's roommate was removed from the home, a person remained in the house who was suffering from a serious physical injury requiring the officers' immediate aid. As we noted above, at the suppression hearing, Ellis testified that, as he approached defendant's house, he was told by dispatch that the dispute was between a man and a woman, and no woman was found in the house before the search. Further, Sapper testified that, although he assumed that the second person whom he removed from the house was the caller, he "was not a hundred percent" certain. Finally, the house showed signs that an assault had taken place—Sapper observed broken objects throughout the house as well as knife slashes on the doorjamb of the room in which defendant's roommate was hiding. Although, by themselves, those facts might support an inference that the officers believed that someone who was seriously physically injured remained in the house, they could also support the belief that Sapper and Ellis did articulate: The continued search of the house was necessary to discover if someone was in the house and if that person was seriously physically injured, requiring their aid. Given that the officers testified at the suppression hearing that they were searching to determine *if* anyone else was even in the house and seriously injured, no trial court could reasonably infer that the officers had the other belief. As a result, the remaining evidence in the record does not contradict our

conclusion that the officers lacked the subjective belief necessary to avail themselves of the emergency aid exception to the Article I, section 9, warrant requirement, and the trial court erred in denying defendant's motion to suppress.

In light of our conclusion that the officers lacked the subjective belief necessary to continue to search defendant's home, we need not address whether any such belief would have been objectively reasonable.

In conclusion, the officers' warrantless search of defendant's house after they removed defendant and his roommate from the home was not justified by the emergency aid exception to the Article I, section 9, warrant requirement because there is no evidence in the record that the officers possessed the subjective belief necessary to avail themselves of that exception. Accordingly, the trial court erred in denying defendant's suppression motion.

Reversed and remanded.