594 March 11, 2026 No. 178

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JOSHUA FLEETWOOD,
*Defendant-Appellant.*

Grant County Circuit Court
21CR28609; A178113

Robert S. Raschio, Judge.

Submitted January 22, 2024.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Andrew D. Robinson, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Patrick M. Ebbett, Assistant Attorney General, filed the brief for respondent.

Before Powers, Presiding Judge, Hellman, Judge, and Armstrong, Senior Judge.

POWERS, P. J.

Reversed and remanded.

POWERS, P. J.

Defendant appeals from a judgment of conviction for one count of felon in possession of a firearm, ORS 166.270, and one count of disorderly conduct in the second degree, ORS 166.025. In his first assignment of error, defendant challenges the admission of statements that he made to an officer while in compelling circumstances before he received *Miranda* warnings. Defendant further argues that the trial court erred in admitting statements that he made after receiving *Miranda* warnings because they were derived from the earlier violation. We first conclude that the trial court erred in admitting defendant's pre-*Miranda* statements because the state failed to prove that the questioning fell within any exception to the *Miranda* requirement under either the Fifth Amendment to the United States Constitution or Article I, section 12, of the Oregon Constitution. However, we conclude that the error was harmless given other evidence adduced at trial. We further conclude that defendant's post-*Miranda* statements were derived from that earlier violation and were thus inadmissible, and that that error was not harmless. In his second assignment of error, defendant asserts that the trial court erred in admitting evidence found during a warrantless search of his garage. We conclude that the trial court did not err in admitting the evidence found during the search of the garage because that search fell within the emergency aid exception to the warrant requirement. Accordingly, we reverse and remand.

## I.  BACKGROUND

We review whether a trial court erred in denying a motion to suppress for legal error. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). We are bound by the trial court's implicit and explicit findings of historical fact as long as there is constitutionally sufficient evidence in the record to support those findings. *Id.* If the trial court did not make express findings on all issues, we presume that the facts were decided in a manner consistent with the court's ultimate conclusion. *Id.* We set forth the facts adduced during the suppression hearing with that standard of review in mind.

Law enforcement responded to reports from defendant's neighbors that they had heard gunshots and a woman

screaming. Grant County Sheriff McKinley spoke with one of the neighbors and learned that the gunshots came from inside defendant's home. McKinley obtained a phone number for the residence and spoke with defendant's wife, who came out of the house and initially told the officers that she was in the house alone. Eventually, defendant's wife explained that defendant was in the house, and she got defendant to come outside. When defendant came outside, he was distraught, sobbing uncontrollably, and intoxicated. McKinley put defendant in handcuffs because defendant's motions and statements made McKinley concerned for officer safety. No party disputes that defendant was in compelling circumstances, and McKinley did not give defendant *Miranda* warnings at that time.

McKinley testified that, while other officers searched the house, defendant made unsolicited utterances while in handcuffs. Defendant explained that he had "punched the garage door," which is what caused the loud noises. He also told McKinley that he and his wife had been in a fight because he was upset about something that she had done. Defendant explained that he had been drinking when he had arrived home from Idaho that day, and that he had a criminal history in Idaho.

While McKinley was with defendant, other officers searched the house. McKinley testified at the suppression hearing that he knew that other people lived in the house and that the other officers were checking the home to see if there were other people that may have been injured or armed. Durr, who also responded that day and was the Chief of Police for the City of John Day at the time, testified that when there is a report of shots being fired, the practice is to clear the residence to see who is inside and that the purpose of the search is to look for a person who is hiding or injured. He explained that he had asked defendant's wife if they could go through the house and that she agreed.[1] Defendant's wife had also told the officers that they could

---

[1] The parties dispute whether defendant's wife's consent to the search was valid, and the trial court determined that it did not need to make that determination. We do not address that question because, as explained below, we conclude that the emergency aid exception to the warrant requirement justified the officers' warrantless search of the house.

not go into one of the rooms because there were dangerous dogs in there. The officers performed a sweep of the house and then asked defendant's wife if she could move the dogs to another room so that they could clear that room. Finally, they asked defendant's wife if they could search the garage, and she said yes.

Although the record is unclear as to precisely how the search unfolded after the officers entered the house, the trial court appeared to find that the officers did an initial sweep of the house—including the garage—to search for people who may have been armed or needed aid. Then the officers asked defendant's wife for her consent to enter the garage a second time to perform a more detailed search. While in the garage during the first search, the officers found two firearms and bullet casings in plain view. During the second, more detailed search, the officers found holes in the walls and ceiling that at least one officer believed were bullet holes.

After the search, the officers walked out of the house announcing that they had found a firearm, and McKinley arrested defendant and read him *Miranda* warnings. McKinley described that defendant continued talking "for hours" after being provided *Miranda* warnings. McKinley further testified that he was aware that defendant may have taken some pills, so he decided to take defendant to the hospital. At some point either during the ride to the hospital or at the hospital, defendant told McKinley that his brother had altered the firearm, and when he tried to shoot it, it would not work. While at the hospital, defendant and McKinley further discussed that incident. The body camera footage relating to defendant's statements at the hospital was admitted into evidence at trial.

In a pretrial motion to suppress, defendant argued that the statements that he made before he received *Miranda* warnings should be suppressed because Article I, section 12, of the Oregon Constitution does not have a public safety exception to the *Miranda* requirement. Defendant further contended that the post-*Miranda* statements should be suppressed because they were tainted by the initial *Miranda* violation. Finally, defendant asserted that the evidence

found in the home should be suppressed because the search of defendant's home was not pursuant to a warrant or any exception to the warrant requirement. Following a hearing on the suppression motion, the trial court made an oral ruling denying defendant's motion to suppress. We set forth the trial court's specific rulings regarding each assignment of error below.

Ultimately, a jury found defendant guilty of felon in possession of a firearm and disorderly conduct in the second degree, and it acquitted him of unlawful use of a weapon. This timely appeal follows.

## II.   ANALYSIS

A.   *Motion to Suppress Pre- and Post-*Miranda *Statements*

1.   *Defendant's pre-*Miranda *statements are not covered by the public safety exception.*

Defendant's first assignment of error challenges the trial court's suppression ruling by arguing that his pre-*Miranda* statements should have been suppressed. In denying defendant's motion to suppress, the court made the following oral findings:

"The officers arrive on scene. Mrs. Fleetwood is called by Sheriff McKinley. She steps out of the house. He requests if there's anybody else in the house. She denies initially anybody else in the house.

"Then upon some further pressure, acknowledges that [defendant] is in the house. *** [S]he goes in and asks [defendant] to come out. [Defendant] comes out. He's immediately placed into custody.

"The officers—and I'll get into the questions of consent and caretaking, warrant exceptions in a moment, but some officers enter into the home. Sheriff McKinley stays with [defendant]. During that time, while there's a search going on, it's unclear to the court how much of the statements were produced by questioning and how much were just the ramblings of [defendant], but the statements that I articulated for the record I would say were produced through the officer contact and questioning.

"And so I would find that he was under compelling circumstances when he made the statements.

"The next question is, is Miranda warranted or required at that point in time or is suppression required?

"It's clear through *State v. Jones*[, 296 Or App 553, 439 P3d 485, *rev den*, 365 Or 557 (2019),] that the courts of Oregon have reviewed with favorability *New York v. Quarles*, 467 [US] 649, a 1984 case, that an individual can be questioned during an initial contact while there's exigency for a public safety purpose, which would include officer safety, including public safety.

"The Court of Appeals has not answered, nor has the Supreme Court answered, whether or not Article I, section 12 of the Oregon Constitution provides additional safeguards. Nothing in this record to me requires the court to find that additional safeguards are required under Article I, section 12 of the Oregon Constitution.

"*Quarles* is a longstanding decision by the United States Supreme Court. It's somewhat surprising that they haven't come to that question, but I would say under these circumstances, the exigency associated with the encounter, the need to determine whether or not there were other individuals involved, warranted the questioning of [defendant] at the scene, and I will not suppress the statements made to [McKinley] under the public safety exception to the Fifth Amendment. And no other basis has been provided to the court that I find would require a different result.

"So that would mean that subsequent statements made after Miranda was given, which was basically the remainder of the encounter after the gun was discovered and announced to Sergeant McKinley, would not be tainted by the previous statements of [defendant]. And so I would not grant the motion on that basis."

On appeal, defendant contends that Oregon does not have a public safety exception to the warrant requirement and thus that all of defendant's pre-*Miranda* statements should have been suppressed. In the alternative, defendant asserts that, even if Oregon has a public safety exception, the state did not prove that McKinley's questions were necessary for safety because the state failed to make a record as to what those questions were.

The state remonstrates that we should adopt the federal public safety exception and that defendant's

pre-*Miranda* statements are admissible under that exception. The state contends that defendant's argument that the state failed to make a sufficient record of the questions that McKinley asked is unpreserved. Finally, the state asserts that, even if the court erred in suppressing the statements, any error was harmless because of how the case was litigated, the jury's verdict, and because the statements were cumulative of other evidence adduced at trial.

Ultimately, we agree with the state's argument that any error in admitting the pre-*Miranda* statements was harmless. Despite that conclusion, however, we must still address whether a *Miranda* violation occurred in order to examine whether defendant's post-*Miranda* statements were derived from an earlier violation. As explained below, we conclude that, because the state did not offer evidence of the questions that McKinley asked defendant, the state failed to prove that McKinley's questions were "necessary to secure [McKinley's] own safety or the safety of the public" under the federal exception to the Fifth Amendment set forth in *New York v. Quarles*, 467 US 649, 659, 104 S Ct 2626, 81 L Ed 2d 550 (1984).

We further conclude that the pre-*Miranda* questioning violated defendant's rights under the Oregon Constitution. Oregon courts have not decided whether Article I, section 12, has a public safety exception to the *Miranda* requirement. *See State v. Jones*, 296 Or App 553, 570, 439 P3d 485, *rev den*, 365 Or 557 (2019) (declining to reach that question because any error in admitting the challenged statements was harmless). However, we conclude that, assuming without deciding that Article I, section 12, has a public safety exception, the trial court erred in admitting the statements under both the state and federal constitutions because the state failed to offer evidence of the questions that McKinley asked defendant before giving *Miranda* warnings.

We first conclude that defendant preserved his argument that the state did not make a sufficient record of the questions. At the suppression hearing, defendant argued that his pre-*Miranda* statements should be suppressed, and the parties did not dispute that defendant was in compelling

circumstances at the time of questioning. *See State v. Love-Faust*, 309 Or App 734, 740, 483 P3d 45, *adh'd to as modified on recons*, 311 Or App 756, 489 P3d 149 (2021) (explaining that compelling circumstances "exist when, viewing the totality of the circumstances, a reasonable person in the defendant's position would feel compelled to answer an officer's questions"). Thus, the state was put on notice that it had to prove that the statements were admissible under the federal and state constitutions. The state has the burden to prove that pre-*Miranda* statements are admissible, it was the state's responsibility to make a sufficient record, and it did not meet that burden.

Next, we turn to whether defendant's pre-*Miranda* statements fell within the federal public safety exception and conclude that they did not. Under the Fifth Amendment, "[n]o person *** shall be compelled in any criminal case to be a witness against himself." If a person is in custody and subjected to interrogation, the person must be informed in "clear and unequivocal terms" that the person has the right, among other rights, "to remain silent." *Miranda v. Arizona*, 384 US 436, 467-68, 86 S Ct 1602, 16 L Ed 2d 694 (1966). Those *Miranda* warnings are thus "prerequisites to the admissibility of any statement made by a defendant." *Id.* at 476.

In *Quarles*, the Supreme Court of the United States determined that there is a "public safety" exception to the requirement that *Miranda* warnings be given before a defendant's statements may be admitted into evidence. 467 US at 655. That exception allows law enforcement to question people who are in custody or compelling circumstances before the person is given *Miranda* warnings if the questions are "necessary to secure their own safety or the safety of the public" and not "designed solely to elicit testimonial evidence from a suspect." *Id.* at 659.

In *Quarles*, the police were investigating an incident where the defendant had allegedly entered a supermarket carrying a firearm. *Id.* at 651-52. The officers found a person who matched the description, and the defendant ran toward the back of the store. *Id.* at 652. One officer held the defendant at gunpoint and ordered him to stop and put his hands

over his head. *Id.* The officer discovered that the defendant was wearing a shoulder holster that was empty, and after handcuffing him, asked the defendant where the firearm was and the defendant pointed to where it was located. *Id.* In the subsequent prosecution, the trial court excluded evidence of the firearm and the defendant's statement about the location of the firearm because the officer had not given him the required *Miranda* warnings. *Id.*

Ultimately, the Supreme Court of the United States concluded that the officer's question about the location of the firearm was necessary "to insure that further danger to the public did not result from the concealment of the gun in a public area." *Id.* at 657. The Court reasoned that the officer "asked only the question necessary to locate the missing gun before advising [the defendant] of his rights. It was only after securing the loaded revolver and giving the warnings that he continued with investigatory questions about the ownership and place of purchase of the gun." *Id.* at 659. Thus, that case demonstrates that, for a court to examine whether pre-*Miranda* questioning satisfies the public safety exception, it is important for a court to know what questions law enforcement asked to determine if the questions were necessary to ensure safety. *See also United States v. Carrillo*, 16 F3d 1046, 1049-50 (9th Cir 1994) (concluding that the officer's question as to whether the defendant had any drugs or needles on his person was a "narrowly tailored question" and thus "was a reasonable attempt by a police officer to insure his personal safety in the midst of a search"); *United States v. Brady*, 819 F2d 884, 888 (9th Cir 1987), *cert den*, 484 US 1068 (1988) (concluding that, although there was conflicting testimony as to what the officer and the defendant said, the questions "arose from [the officer's] concern with public safety, his desire to obtain control of what could be a dangerous situation. They were not designed to obtain evidence of a crime.").

Here, there is no evidence in the record as to the specific questions that McKinley asked defendant. The state's written response to the motion to suppress outlined some specific questions; however, a prosecutor's representations in a written response to a motion to suppress are not

evidence. McKinley's testimony at the suppression hearing did not provide evidence of those questions either.

McKinley testified at the suppression hearing that he had put defendant in handcuffs because of officer-safety concerns, that defendant made "unsolicited utterances," and he testified about the specifics of defendant's statements. McKinley further testified about his motivation for questioning defendant:

> "I'm still trying to figure out what's going on, I'm still trying to find out if there were other individuals in the home, all of that. So [defendant is] talking to me while other officers are making contact with Ms. Fleetwood at that point and entering the home and checking it for other individuals or other persons that may have been injured, armed, or otherwise their safety had been threatened."

Although McKinley testified that his motivation for talking to defendant before giving him *Miranda* warnings was to figure out what was going on and if other individuals were still in the house, at no point did he describe what specific questions he asked defendant that would have achieved his goal. Indeed, the trial court concluded that, under the circumstances of this case, including "the exigency associated with the encounter, the need to determine whether or not there were other individuals involved, warranted the questioning of [defendant] at the scene." However, the court explained that "it's unclear to the court how much of the statements were produced by questioning and how much were just the ramblings of" defendant. Thus, the court's comments specifically acknowledged that it did not know what questions McKinley asked defendant.

Without providing any evidence of the questions that McKinley asked defendant, the state could not meet its burden to demonstrate that McKinley's questions were "necessary to secure [the officer's] own safety or the safety of the public." *See Quarles*, 467 US at 657 (concluding that the "need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination"). Furthermore, for the same reasons, we cannot conclude that the pre-*Miranda* questioning satisfied

a public safety exception under Article I, section 12, assuming there is one. As a result, the trial court erred in admitting the pre-*Miranda* statements under both the state and federal constitutions.

  2.  *Admission of defendant's pre-*Miranda *statements was harmless.*

    Because we conclude that the pre-*Miranda* questioning violated defendant's rights under both the state and federal constitutions, we analyze whether the statements were harmless under both harmless error tests. Ultimately, we conclude that the admission of the statements was harmless. Under Article VII (Amended), section 3, of the Oregon Constitution, we must affirm a judgment despite an error if there is "little likelihood that the error affected the verdict." *State v. Davis*, 336 Or 19, 30-32, 77 P3d 1111 (2003). To determine whether erroneously admitted evidence affected the verdict, "we consider the nature of the evidence in the context of the trial as a whole." *State v. Simon*, 294 Or App 840, 849, 433 P3d 385 (2018), *rev den*, 365 Or 502 (2019). In considering harmlessness, we "review all portions of the record, not just the evidence most favorable to the state." *Id.* Moreover, "[a]mong other factors, we consider whether the evidence was cumulative of other evidence admitted without objection, which includes assessing any differences in the quality of the erroneously admitted or excluded evidence as compared to the other evidence on the same issue." *Id.*

    Similarly, a federal constitutional error is harmless, such that the conviction will be upheld, "if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall*, 475 US 673, 681, 106 S Ct 1431, 89 L Ed 2d 674 (1986) (describing the test announced in *Chapman v. California*, 386 US 18, 24, 87 S Ct 824, 17 L Ed 2d 705 (1967)). In reviewing the whole record to determine whether an error was harmless, we consider "the importance of the [improperly admitted evidence] in the prosecution's case, whether the [evidence] was cumulative, the presence or absence of evidence corroborating or contradicting the [improperly admitted evidence] on material points, the extent of cross-examination otherwise permitted, and, of

course, the overall strength of the prosecution's case." *Id.* at 684.

The pre-*Miranda* statements that the state offered at trial were that defendant had imbibed a large amount of whiskey, had just come back from Idaho, and had punched the garage door.[2] We consider each one in turn.

The court's admission of the statement that defendant had drunk a large amount of whiskey was harmless because it was cumulative of other, unchallenged evidence admitted at trial. Defendant's wife testified that defendant had been drinking and had taken pills, and an officer testified that defendant appeared intoxicated when they arrived on the scene. The court's admission of defendant's statement that he had just come back from Idaho was harmless because it was not relevant to any element of the charges. Finally, the court's admission of defendant's statement that he had punched the garage door was harmless because the defense theory at trial was that defendant had not shot a firearm and the loud noise heard by the neighbors was defendant punching a metal garage door. Defendant's statement supported that theory, as did his wife's testimony that the loud noise was a result of defendant slamming the metal garage door. The jury acquitted defendant of unlawful use of a weapon, and thus the jury was likely persuaded by that defense theory. Therefore, the court's error in admitting defendant's pre-*Miranda* statements at trial was harmless under both the state and federal constitutions.

3.   *Defendant's post-*Miranda *Statements*

We turn to defendant's challenge to the admission of his post-*Miranda* statements. As an initial matter, and as the parties' arguments suggest, the record is sufficiently developed for us to determine whether the post-*Miranda* statements derived from the earlier violation, which is an issue that the trial court did not reach because it had determined that there was no prior *Miranda* violation. As explained below, we conclude that defendant's post-*Miranda* statements were derived from the earlier *Miranda* violation

---

[2] Defendant also told McKinley that he had a criminal history in Idaho; however, the state did not offer that statement at trial. Accordingly, we do not consider that statement in our harmlessness analysis.

and should have been suppressed. On appeal, defendant focuses on one of his post-*Miranda* statements to argue that it was a product of the earlier *Miranda* violation and thus that the trial court erred in failing to suppress his statements. Specifically, defendant contends that the state failed to prove that his admission that he had tried to kill himself with a firearm was not the product of the earlier *Miranda* violation. Defendant maintains that there was no break in McKinley's custody of defendant between the initial violation through the trip to the hospital. Moreover, defendant asserts that he was extremely intoxicated, and thus there is no reason to assume that the belated warning would have dissipated the effects of the earlier violation, given that he was too intoxicated to be deterred from speaking.

For its part, the state first contends that the encounter that occurred after receiving the warnings was much longer than the brief encounter that occurred before it. Second, the state asserts that there was a break in questioning—McKinley arrested defendant, then *Mirandized* him and took him to the hospital—and most of defendant's statements occurred at the hospital. Third, the state remonstrates that McKinley did not point out to defendant that he had already made incriminating disclosures. Finally, the state argues that, like in *State v. Vondehn*, 348 Or 462, 485-86, 236 P3d 691 (2010), the questioning before the *Miranda* warnings was conversational and short in duration, and the circumstances were far less coercive here because defendant was not sitting in the back of a patrol car.

In their briefs, both parties rely solely on attenuation cases under state law and do not advance any argument under the federal constitution. In addition, as explained below, we conclude that the post-*Miranda* statements were derived from the earlier *Miranda* violation under the state constitution. Therefore, because defendant does not advance a federal constitutional argument and because we conclude that the trial court erred in admitting the statements under the Oregon constitution, we need not address the federal constitutional analysis.

Article I, section 12, of the Oregon Constitution provides that "[n]o person shall be *** compelled in any

criminal prosecution to testify against himself." To protect that constitutional right, police must give *Miranda* warnings before questioning a person who is in custody or compelling circumstances. *State v. Jarnagin*, 351 Or 703, 713, 277 P3d 535 (2012). When law enforcement fails to give *Miranda* warnings, we suppress not only the statements that a suspect makes in response to questioning but also evidence that "derives from or is a product of that constitutional violation." *Id.* To determine whether evidence derives from a prior *Miranda* violation, we consider the totality of the circumstances, including:

> "[T]he nature of the violation, the amount of time between the violation and any later statements, whether the suspect remained in custody before making any later statements, subsequent events that may have dissipated the taint of the earlier violation, and the use that the state has made of the unwarned statements."

*Id.* at 716. If law enforcement ultimately gives belated *Miranda* warnings, "the relevant inquiry must be whether the belated warnings are effective and accomplish the purpose for which they are intended." *Vondehn*, 348 Or at 480. The state must establish that the belated warnings were effective. *Id.* at 481.

We conclude that the state did not offer sufficient evidence for the trial court to conclude that the statements were not derived from the earlier *Miranda* violation. The state argues that defendant's encounter with McKinley before he was *Mirandized* was shorter than the post-*Miranda* conversation. The evidence of the length of the initial encounter was McKinley's testimony that it "was maybe five to seven minutes. I couldn't say exactly. It would be in my video." Moreover, McKinley testified that, after providing *Miranda* warnings, defendant continued talking "for hours." Although there is evidence that the amount of time of the post-*Miranda* encounter was much longer than the pre-*Miranda* questioning, that does not outweigh that there was no break in the questioning. The evidence shows that, after McKinley arrested defendant and read him his *Miranda* warnings, defendant continued talking on the scene, on the way to the hospital, and at the hospital.

Although the statement offered at trial occurred at the hospital, it appears that defendant had also made statements about his brother's firearm earlier in the police car on the drive to the hospital.

In sum, the record demonstrates that defendant was talking to McKinley nonstop starting from when McKinley initially put defendant in handcuffs, during the car ride to the hospital, and throughout the visit to the hospital. Although we agree with the state's argument that McKinley did not point out to defendant that he had already made incriminating disclosures and that the circumstances were likely less coercive than in *Vondehn*, the state did not carry its burden to prove that defendant's statements following the *Miranda* warnings were not derived from McKinley's pre-*Miranda* questioning. Over the entire period of time, McKinley was the only officer asking defendant questions, and there is no evidence in the record that the types of questions McKinley asked were different in nature before and after giving *Miranda* warnings. *Cf. Jarnagin*, 351 Or at 723 (determining that *Miranda* warnings were effective and reasoning, in part, that there was a substantial break in time between the sets of questions where the defendant was at home with a friend, and the person who asked the subsequent questions was a different person). Given the circumstances here, there was no break or subsequent event that could have "dissipated the taint of the earlier violation." Therefore, we conclude that the state failed to carry its burden to prove that the post-*Miranda* statements were not derived from the prior violation, and the trial court erred in failing to suppress them.

Having concluded that the trial court erred and should have suppressed the post-*Miranda* statements, we turn to harmlessness. The state contends that, even if the trial court erred, the admission of the post-*Miranda* statements was harmless. *See Davis*, 336 Or at 30-32 (describing the standard for assessing harmless error). We disagree with the state's contention.

Defendant's statement that his brother had altered the firearm and that it would not fire when defendant tried to shoot it was relevant to whether defendant possessed and

discharged a firearm. Although the jury acquitted defendant of unlawful use of a weapon, those statements were also relevant to the felon in possession charge. Moreover, although defendant testified at trial that he carried the firearm from the car to the garage that day—thus potentially admitting to moving the firearm if the jury believed that testimony—those statements are not cumulative of each other and are qualitatively different. Furthermore, during closing argument, the state relied on both of those factual circumstances when discussing the felon in possession charge. *Simon*, 294 Or App at 849 (explaining that when assessing harmlessness, we "consider how the case was tried and the extent to which the disputed evidence was or was not emphasized by the parties and central to their theories of the case"). Specifically, the state pointed to evidence that, while in the hospital, defendant "talked about [how] he wanted to take his life and that he had a gun that his brother removed a bullet from the chamber or he would be dead today." The state further noted that, "while [defendant was] on the stand, he tells you, that gun, the 9-millimeter, belongs to his brother. It was in the car, and he carried it from the car to the house." Each statement describes a different situation in which defendant may have possessed the firearm, and we do not know what evidence led the jury to find defendant guilty of the felon in possession charge. Therefore, admission of defendant's post-*Miranda* statements was not harmless.

B.  *Motion to Suppress Evidence Derived from the Search of the House*

Defendant's second assignment of error challenges the trial court's denial of defendant's motion to suppress evidence derived from the search of his home.[3] The court concluded that the search of the house and garage was justified by the emergency aid exception:

"Turning to the entrance into the home, clearly a warrantless search. It is, *per se*, illegal under the Oregon

_____

[3] In his first assignment of error, defendant also challenges the physical evidence found during the search of the house, arguing that it was derived from the *Miranda* violation. As explained below, however, because we conclude that the officers entered the house pursuant to the emergency aid exception to the warrant requirement, we need not address whether the officers' entry into the house was derived from the *Miranda* violation.

Constitution to search a home without a valid exception to the warrant requirement. Here the state is approaching the question in two ways. Third-party consent to search the home and under a caretaking exception.

"So let me start with the caretaking exception and then plain view. The officers have an active shooting circumstance. [Defendant's counsel] asks the court to assume something that was clearly not being assumed by the officers at the time, that [defendant] was the shooter and he was the only shooter in the home.

"They have no reason to make that particular determination at the time. They're not aware of what the whole circumstances are. They have somebody who—and Ms. Fleetwood who has been immediately untruthful with them, and then they are not sure what is happening inside that home. They know that there are other people who have lived in that home, including a mother-in-law which they had—So they went through, searched the home under a caretaking exception, did a sweep of the property.

"They do a sweep of the property, get into the garage, and find in the garage in plain view a—I think a 9-millimeter weapon, a firearm, pistol, with the magazine out, with two live rounds on the ground, along with at least one, maybe two empty shell casings in plain view.

"Community caretaking exception does not allow for anything that is searched for, in other words, moved around or otherwise exposed through the searching of spaces, to be seized or to have actual—be allowed within a court proceeding.

"However, the Court of Appeals—the Supreme Court has found that if, during the caretaking sweep of a home, they see something in plain view, they are able to seize that if they believe that it is evidence of a crime.

"And they had here a shots-fired call. Shooting a firearm inside the city limits is against the law, and so they were authorized to seize the gun under a community caretaking plain view exception to the warrant requirement under all the exigency of the circumstances. That does not lead the court to any kind of consent question."

Defendant then asked the trial court to make findings on the issue of consent because defendant argued that

the testimony from Durr was that the examination of the holes in the walls that the officers thought were bullet holes was part of the second, more detailed search of the home. The court then made further findings and concluded that defendant's wife gave consent to enter the garage:

> "I don't know that the initial consent and entry of the house is really all that particularly relevant. The next question was whether or not she gave consent to search the garage. They're already inside the home and they ask for consent to search the garage area, after they'd already entered the home, and she was not at that point under gunpoint.

> "The officers were inside her home. They are allowing her to transition through different spaces with them as they're searching, and they're using a courtesy that I'm not particularly familiar with at all times in these types of circumstances, asking her if they can go into next rooms.

> "Then she does, in fact, consent, without any kind of restraint or without being under any kind of threat or any—she's not under gunpoint or anything like that, she consents to allow them to search the garage.

> "* * * * *

> "In fact, Sergeant Hutchison went further and asked her if she had authority to allow them to be in the garage, and she said she went in there two to three times a day, and ultimately she did have the authority to allow them to search, and she agreed to that search.

> "So at that point that there's any issues with consent, which would be the searching the second time inside the home, Mrs. Fleetwood clearly was not in a compelling circumstance. She was standing, in [exhibit] 102, freely, with her arms crossed, talking to the officers. Not under any kind of arrest. No officer standing near her in any way trying to compel her to get them to allow the search.

> "So I would find that her consent to the search of the garage, under all the circumstances, was voluntarily given, and lawful, and the state had every right to—had every authority to rely on that third-party consent to search that room.

> "So I will deny the defense's motion to suppress[.]"

1.  *Emergency aid exception*

We first address whether the officers' initial sweep of the house was constitutional under the emergency aid exception. On appeal, defendant contends that the record reflects two distinct searches: an initial search where the police cleared the main part of the house and a second search of the garage, to which defendant's wife purportedly gave separate, specific consent. It was during that second search, defendant argues, that the officers discovered the firearms, shell casings, and bullet holes. However, the trial court's findings do not reflect defendant's view of the record.

The trial court found that the officers found in the garage a firearm in plain view "with two live rounds on the ground, along with at least one, maybe two empty shell casings in plain view." The court then discussed the officers "searching the second time inside the home," which involved a more detailed search of the garage where the officers found bullet holes in the walls. Therefore, as we understand it, defendant is referencing that second more detailed search of the garage when he contends that the officers performed a second search without a valid warrant and without consent from defendant's wife.

We begin with defendant's arguments regarding the initial sweep of the home. Defendant asserts that the emergency aid exception did not justify the initial sweep of the house nor the subsequent entry into the garage.[4] Specifically, defendant contends that the police did not have sufficient reason to believe that any particular person was harmed or at risk of being harmed because, with defendant and his wife already accounted for, there was insufficient evidence of an identifiable victim or perpetrator. The state remonstrates that the reports of a woman screaming followed by gunshots and the officers' knowledge that other people lived in the house justified the officers' entry into the house and garage under the emergency aid exception. We agree with the state's argument.

---

[4] Defendant acknowledges that the trial court ruled that the searches were justified under a "caretaking" exception to the warrant requirement but assumes that the court meant to refer to the emergency aid exception. We agree with defendant's assessment and analyze the situation under the emergency aid exception.

Under Article I, section 9, of the Oregon Constitution, a warrantless search is *per se* unreasonable unless the search falls within one of the few specifically established and well-delineated exceptions to the warrant requirement.[5] *State v. Fessenden / Dicke*, 355 Or 759, 764, 333 P3d 278 (2014). The state has the burden to prove that the circumstances satisfied one of the exceptions. *State v. Galitzen*, 345 Or App 57, 61, 581 P3d 1019 (2025). The "emergency aid exception" justifies a warrantless search when "police officers have an objectively reasonable belief, based on articulable facts, that a warrantless entry is necessary to either render immediate aid to persons, or to assist persons who have suffered, or who are imminently threatened with suffering, serious physical injury or harm." *State v. Baker*, 350 Or 641, 649, 260 P3d 476 (2011) (footnote omitted). There must be a "reliable, objective indicia of a potential victim of a dangerous circumstance or a potential perpetrator of a dangerous act," otherwise the risk of harm is purely speculative. *State v. Burdick*, 209 Or App 575, 581-82, 149 P3d 190 (2006). As we have explained:

> "If officers believe only that a search is necessary to discover if there is a person in the location who needs immediate aid, rather than that the search was necessary because a person who is seriously injured needs their aid, officers are acting with a 'purely speculative' belief that there is a 'risk and gravity of harm' requiring their immediate action. A speculative belief that someone might require aid does not justify a warrantless search under the emergency aid exception."

*State v. Hamilton*, 285 Or App 315, 323, 397 P3d 61 (2017) (citation omitted).

Defendant argues that this case is similar to *State v. Fredricks*, 238 Or App 349, 358-59, 243 P3d 97 (2010), where we concluded that, because the officers heard an argument but did not hear any sounds consistent with physical injury and the officers determined that all possible victims had not been physically harmed, the emergency aid exception did

---

[5] Although defendant cites to a single federal case in a footnote in his opening brief, he does not adequately develop a federal argument. Accordingly, we do not address it. *See State v. Amaya*, 336 Or 616, 634 n 6, 89 P3d 1163 (2004) (declining to address undeveloped federal constitutional arguments).

not justify the officers' entry into the hotel room. Defendant contends that here, like the situation in *Fredricks*, although it was theoretically possible that another person was concealed in the house, there was no evidence that an identifiable victim or perpetrator would be discovered by entering the home.

We disagree with defendant's argument that the officers' belief that there was an armed person in the house or someone in need of aid in the house was speculative. Here, responding to a report of gunshots and a woman screaming, the officers determined that the noises came from defendant's residence. Although defendant and his wife ultimately came out of the house, the officers knew that other people lived in the house, and thus it was not speculative for the officers to believe that someone else was in the house who was either armed or injured. Moreover, defendant's wife was initially untruthful with the officers when she claimed that defendant was not in the home, so it was reasonable for them not to believe her when she said no one else was there. Specifically, one officer testified,

> "I felt that given the situation, with the woman screaming, followed immediately by three gunshots, the deceptiveness of her telling us that there was nobody else in the house, and then we come to find out there was somebody else in the house, I honestly kind of expected to find somebody that was either injured or killed in the house."

In short, there is sufficient evidence that the officers subjectively believed that there was another person in the house who could have been armed or who needed immediate aid. Moreover, because the officers knew that other people lived in the home and defendant's wife had initially been dishonest about who was in the home, their belief was objectively reasonable and supported by evidence in the record. Because we conclude that the officers entered the house under a valid exception to the warrant requirement, any evidence that was found in plain view during the search was admissible at trial. *See, e.g.*, *State v. James*, 336 Or App 55, 66, 560 P3d 747 (2024), *rev den*, 373 Or 282 (2025) (explaining that the "plain-view" doctrine "authorizes seizure of evidence under circumstances where the police are in a place where they

are entitled to be when they observe the evidence in plain view and the incriminating character of the evidence is immediately apparent" (internal quotation marks omitted)). Therefore, the trial court did not err in admitting evidence of the firearms and bullet casings that were found in plain view during the initial sweep of defendant's garage.

2.  *Consent to the search of the garage*

The next question is whether defendant's wife gave consent for the officers to enter the garage a second time to perform a more detailed search, which is when they found what they believed to be bullet holes in the walls. As an initial matter, defendant does not set forth an argument as to whether his wife's consent to the search of the garage was valid. The focus of defendant's argument on appeal is that his wife's consent as to the initial entry was invalid and that the emergency aid exception did not apply, and thus the first and second searches of the garage were a product of the initial unconstitutional sweep. Specifically, defendant argues, "Even if defendant's wife voluntarily consented to the garage search, the garage search and the evidence found there were the products of the initial sweep, and no exception to the warrant requirement justified that search." (Emphasis omitted.) According to defendant, because there was no valid warrant exception for the initial sweep, his wife's consent provides no basis for affirmance on appeal. Defendant asks us to remand to the trial court to rule on the voluntariness of his wife's consent to the initial sweep. As explained above, however, we conclude that the officers' initial sweep of the home was pursuant to a valid exception to the warrant requirement, and thus the second search of the garage was not a product of an initial unconstitutional search. Given that defendant does not advance an argument on appeal as to whether his wife's consent to enter the garage a second time was voluntary, we need not reach that question on appeal.

Reversed and remanded.